641 So.2d 1377 (1994)
CITY OF POMPANO BEACH, Appellant,
v.
YARDARM RESTAURANT, INC., Appellee.
No. 91-1829.
District Court of Appeal of Florida, Fourth District.
September 9, 1994.
*1378 Henry Latimer of Eckert, Seamans, Cherin & Mellott, Fort Lauderdale, for appellant.
Gale Ciceric Payne and James C. Pilkey of Payne, Pilkey & Assoc.; Earl Faircloth and Randolph W. Adams, Fort Lauderdale, for appellee.
*1379 GRIFFIN, J., Associate Judge.
This is the appeal of a non-final order[1] in a non-jury action finding the City of Pompano Beach ["Pompano Beach" or "City"] liable for the inverse condemnation of property owned by the Yardarm Restaurant, Inc. ["Yardarm"]. We reverse because the record fails to establish the requisite taking and because any "taking" claim would be time barred.
Yardarm, which was held in equal shares by brothers Jim and Tom Stephanis, had operated a successful restaurant[2] in Pompano Beach from 1959 until 1972 on a parcel of land that overlooked the Hillsborough Inlet with a view of the Hillsborough Inlet lighthouse [the "east parcel"]. In 1972, Yardarm decided to make a more profitable use of its property by building a European-style grand hotel and marina on the property. Yardarm's initial plans, which called for an eighteen story, 165 room hotel and marina, were submitted for approval to Pompano Beach in February 1973.
Yardarm's plans were met with vigorous public opposition, especially from a condominium association across from the Yardarm which feared that the hotel and marina would block its members' view of the inlet and lighthouse. In apparent response to the opposition, on May 1, 1973, the Pompano Beach commission passed an ordinance imposing a ten-story height restriction on new buildings in Pompano Beach.
Yardarm applied for an exception to the ordinance, and despite continued opposition to the plan, on October 2, 1973, Pompano Beach passed ordinance number 73-96, which had the effect of granting a special use exception to Yardarm allowing the construction of an eighteen story hotel. Yardarm received a building permit for the project on February 14, 1974, as well as a permit for its docks and quays. Four days later, however, Pompano Beach revoked the permits due to claimed "administrative oversights," including a dispute over the number of parking spaces required for the project. In June 1974, Yardarm filed suit in Broward Circuit Court against Pompano Beach to force the issuance of its permit.
Two years later, in September 1976, the court ruled that, although Pompano Beach had "the right, and probably the duty," to rescind the permit it had issued on February 14, 1974, Yardarm was "entitled to apply for a new permit upon the presentation of plans that [were] in compliance with the building and zoning laws that were applicable on February 14, 1974." The court observed that the omissions and errors contained in Yardarm's plans were "such that the Building Official ordinarily would not have refused the permit," absent the "obvious desire by the City to oppose the granting of the building permit to the Plaintiff."
Pompano Beach did not appeal the court's decision, and Yardarm resubmitted its plans in September 1976. However, Pompano Beach again refused to issue a building permit, claiming that Yardarm had still failed to provide sufficient parking to comply with the building code, an issue which had not been directly addressed in the court's earlier order. Accordingly, in February 1977, Yardarm sought supplemental relief from the circuit court to require issuance of its permit. The court found in favor of Yardarm on the question of parking and Yardarm was issued a building permit on March 15, 1977, the day following the court's ruling.
Due to expenses associated with its fight to obtain the permit and rising construction costs, Yardarm claims it was no longer able to finance construction on its own. Nonetheless, Yardarm decided to proceed with preliminary site work on the project while it sought permanent financing. With its permit finally in hand, in April 1977, Yardarm closed and demolished the restaurant and began preliminary site work on the hotel.
After demolishing the restaurant, however, Yardarm realized that its new permit (unlike the earlier permit) did not contain approval for its seawall, dock and quays. With site preparation continuing, in May 1977, Yardarm sought City approval of its seawalls *1380 and docks. Pompano Beach eventually approved the seawall, but refused to issue a dock permit, as did the board of appeals.
In January 1978, now with more than $591,000 invested in the project, Yardarm brought suit against Pompano Beach to require it to issue a permit for construction of the dock. While the lawsuit was pending, Yardarm slowed, and eventually stopped, construction of the hotel, apparently because of estimates that it would cost $500,000 more to build the docks after construction of the hotel. In the meantime, Yardarm unsuccessfully continued to pursue permanent financing for the hotel.
Nearly one year later, in December 1978, following trial, the parties stipulated to an order which permitted Yardarm to build a dock seventy-five feet into Hillsborough Bay. However, following entry of the order, Yardarm did not resume construction of the hotel. It now faced hearings before the Corps of Engineers [the "Corps"] on the question of the issuance of a permit concerning the dock. Although Pompano Beach had been required by the December 1978 order to furnish any written assurances to the Corps, Pompano Beach's city manager not only requested that Yardarm's application for a permit be denied, but requested a public hearing on the issuance of the permit in the event the Corps was undecided on the issue.
The Corps eventually issued the permit, but in July 1979, while the hearings requested by Pompano Beach were still in progress, Pompano Beach determined that Yardarm's building permit had lapsed due to a work suspension in excess of ninety days. In making this determination, Pompano Beach relied on their recently enacted rule that work requirements would not be tolled by litigation between the parties. Yardarm maintained that the applicable rules were those in place in 1974, when it applied for its permit, which rules preserved the permit where a work stoppage was caused by litigation.
Relying on the 1974 rules, Yardarm went back to court in July 1979, asking for an order requiring Pompano Beach to reissue the building permit. Yardarm apparently lost before the hearing officer, but three months later, in September 1979, the board of appeals (which was chaired by Yardarm's architect) reinstated Yardarm's permit.
Pompano Beach appealed the board's ruling and issued a stop work order until an appeal to the circuit court was decided. Once the circuit court ruled in favor of Yardarm in December 1979, finding that the applicable rules were those in place in 1974, Pompano Beach filed a petition for writ of certiorari to the Fourth District Court of Appeal, and this time Pompano Beach issued a stop work order until the appeal or a subsequent appeal (if one was taken) to the supreme court was decided.
While the appeal was pending, Yardarm unsuccessfully continued to cast about for financing for the project. Construction costs had assertedly risen from $4.3 million in 1974 to more than $14 million in 1980. Nevertheless, Yardarm's advisors recommended the owners purchase a second parcel, west of the property Yardarm already owned, when it became available. They believed it would make the project more attractive to institutional lenders and would enable Yardarm to sign a management contract with a major hotel chain. In order to finance the purchase, however, Yardarm would have to mortgage the east parcel. Yardarm purchased the west parcel on February 14, 1981.[3]
Five months after Yardarm purchased the west parcel, in July 1981, the Fourth District Court of Appeal ruled on Pompano Beach's petition for writ of certiorari, which was directed solely to Pompano Beach's contention that the board's original order was not supported by substantial competent evidence. The court agreed with Pompano Beach that no true "evidence" had been presented to the board since the parties had relied on the argument of counsel. Nonetheless, the court held that since Pompano Beach had actively participated in the proceedings before the board without objection, it could not "be *1381 heard to complain about the meeting's irregularities," and denied the petition.[4]
Approximately two weeks after the Fourth District's ruling on July 16, 1981, Yardarm's building permit for the east parcel was reissued by Pompano Beach. Because of its intervening purchase of the west side property, however, Yardarm had to redraw its plans and attempt to obtain plat approval for a building on the west side. Yardarm continued to pursue financing, this time for the consolidated project.
Recognizing that at this point it had little chance of obtaining permanent financing without a partner to guarantee its loan, Yardarm turned to Ralph Mann and Ron Schroeder of the Glen Ivy Financial Group. Mann and Schroeder agreed, in exchange for a percentage of hotel profits, to let Yardarm use their financial statements in order to obtain financing. Bank of America in San Francisco suggested Ridge Mortgage in New Jersey, a company allegedly having access to union funds. Ridge Mortgage required Yardarm to deposit in excess of $200,000 as an application fee. This turned out to be a scam and Yardarm lost the $200,000 commitment.
Following the problems with Ridge Mortgage, Yardarm continued to submit loan packages; however, because Yardarm had been required to take on a partner, it refused to consider any loan which would not fully compensate it up front for the property and repay its costs  a total of approximately $6,000,000.
Despite its continuing problems, Yardarm received two substantial offers to buy its stock in 1983. On April 28, 1983, Yardarm received an offer of $6 million for Yardarm's stock with an assumption of Yardarm's outstanding $2.2 million mortgage. This offer was withdrawn on May 5th, 1983, when the buyer learned that there was an outstanding option to purchase the property which had been given by Yardarm. Yardarm received an offer from a second purchaser in August 1983, for $8,000,000. Yardarm rejected the offer because it felt it was too low.
While Yardarm allegedly waited for approval of its west side permits, it took out a number of short term loans to fund the minimal construction necessary to prevent its permit on the east side from being revoked for lack of work and to pay its consultants while it sought approval of the west side. In January 1984, Yardarm took out the last of its loans, a $2.8 million loan with Sunrise Savings and Loan ["Sunrise"], part of which was used to retire Yardarm's prior loans; the remainder was used to fund sufficient construction to keep the east side permit in place.
Yardarm obtained plat approval for the west side in 1982 and site plan approval in 1984, but apparently never submitted an application for a building permit on the west side before Sunrise filed for foreclosure on May 8, 1985. With the property in foreclosure, Yardarm's permit on the east side was again revoked for insufficient work. Yardarm was informed, however, that it could reinstate the permit by refiling plans within 180 days. This deadline set by Pompano Beach would expire October 30, 1985. With the building permits lapsed, Pompano Beach also began to consider repealing the ordinance under which Yardarm had obtained its eighteen story special use exception.
The first reading of the ordinance repealer took place on September 3, 1985, and a second reading was scheduled for October 29th. In the meantime, on October 10, 1985, Yardarm submitted a consolidated plan for construction covering both parcels. Once Yardarm learned, however, that repeal of the special exception ordinance was under consideration and with its permit deadline two days away, Yardarm filed suit to enjoin the Pompano Beach city commission from meeting to repeal the eighteen story ordinance. The trial court granted the injunction on November 20, 1985.
Pompano Beach appealed the entry of the injunction, but gave Yardarm tentative approval for its consolidated plan on February 26, 1986. By this time, however, a final *1382 judgment of foreclosure had already been entered against both properties and a foreclosure sale was set for March 21, 1986. On March 4, 1986, Pompano Beach gave Yardarm site approval for the project and notified it that it had 180 days to obtain a building permit for the consolidated project, but on March 20, 1986, Yardarm filed for protection in bankruptcy court. The bankruptcy stay was later lifted and the property was sold in foreclosure to the FSLIC as receiver for Sunrise. As the lower court observed, the ironic end to this sorry saga was that Pompano Beach then purchased the land from the FSLIC. Yardarm estimates that as of the foreclosure, the land was worth $6.2 million.
In July 1987, the Fourth District Court ruled in favor of Pompano Beach in its appeal from the order enjoining it from repealing the eighteen story ordinance.[5] The issue on appeal was whether Pompano Beach's action in attempting to revoke the ordinance involved a gross abuse of discretion. Yardarm apparently argued that Pompano Beach was estopped from revoking the ordinance as to Yardarm. In holding that Pompano Beach was not estopped, the court found: (1) Pompano Beach's earlier obstructionist tactics would not form the basis for an estoppel since those tactics ceased in 1979 and Yardarm had still failed to make any real progress on the hotel in the intervening years; (2) Pompano Beach's refusal to process the application in 1985 could not form the basis for an estoppel since Pompano Beach was entitled to delay issuance of the permit given that a zoning change was in progress; and (3) Pompano Beach was not equitably estopped from revoking the ordinance (exception) as to Yardarm because there had been no showing that Yardarm had incurred "extensive obligations" or undergone such "a change in position" so as to make the doctrine applicable.
On September 15, 1987, Yardarm filed the instant action against the City of Pompano Beach for inverse condemnation of its property. The complaint alleged that Pompano Beach's extended obstruction of Yardarm's attempts to build its hotel and marina had worked an inverse condemnation of Yardarm's property of both a temporary and a permanent character.[6] Pompano Beach denied any taking had occurred, and asserted a number of affirmative defenses, including res judicata, collateral estoppel, law of the case and the statute of limitations. When Yardarm ultimately identified the precise date of taking as October 30, 1985, the date on which its right to reinstate the building permit on the east side expired, Pompano Beach also asserted the defense of failure to exhaust administrative remedies.
At trial, Yardarm's case was based on evidence that City officials had willfully obstructed construction on the east side from at least 1974 though 1981; that after 1981, the City harassed Yardarm continually; and that Yardarm repeatedly tried to obtain financing for the entire property from 1981 through 1985 but could not do so because of Pompano Beach's earlier activities. Pompano Beach's case centered on evidence that its obstructionism had ended, at the latest, in 1981; that Yardarm's inability to obtain financing was due to a number of causes unrelated to Pompano Beach's earlier actions; and that Yardarm had ultimately lost the property because it had mortgaged the east side property to buy the west side. Pompano Beach also presented evidence concerning the offers to buy both properties for $8,000,000 which Yardarm had rejected in 1983.
In its final order, the court found that Pompano Beach had effected a permanent taking of Yardarm's property on October 30, 1985, based on its history of obstructing the issuance of Yardarm's permit. The final judgment expressed the lower court's reasoning:
As to the taking, Yardarm's cause is pregnant with equity. The only embryo the court can countenance (by the City) was the action taken by Walter Williams, *1383 the Chief Building Official; however, the City's obstructionist and illegal acts aborted Williams' professed policy toward Yardarm long ago. The course of action chosen by the City initially and throughout the years that the parties have been engaged in litigation, must be described not only as arbitrary but also must be equated with "unfair dealing." Every citizen (which includes Yardarm) has the right to expect that he will be dealt with fairly by his government. Unfair dealing by a municipality carries with it the attendant responsibility for the adverse effect it knows or should know its deliberate inaction will have upon the parties with whom it is dealing. See Hollywood Beach Hotel case.
The first factor to be taken into consideration by the landmark case of Penn Central Transportation Co. is the economic impact the governmental action has on the claimant. In this case, Yardarm and its stockholders ultimately filed for bankruptcy primarily because of the City's action. Probably the two most important factors cited in the Penn Central case are the "character" of the governmental action and whether the governmental tribunal reasonably concluded that the "health, safety, morals and general welfare" would be promoted prohibited particular uses of land. As to the "character" of the action taken here, it was purely political. The Hillsborough Association, through Fletcher Riley, jumped on the Yardarm issue knowing that the Mayor and the other Commissioners would march to their tune because of the upcoming election. Further, at no time can it be said that the regulatory actions taken by the City promoted safety, morals, health and the general welfare of the City. The only thing promoted by the politicians was the protection of the property owners (Hillsborough Association) from having their view of the ocean and light at the lighthouse obstructed by the construction of the hotel. This distinction is important because City's counsel have relied on the First English Evangelical Church case for the proposition that the landowner must prove that he was denied all use of his property. In the Court's view First English Evangelical Church is distinguishable because the ordinance in that case prevented the construction of buildings in a flood prone area which certainly promoted the general welfare and safety of the community. In this case, it is undeniable that the only circumstance which necessitated the regulatory action was the adverse political climate which wrought defeat on those commissioners who voted in favor of constructing the hotel.
Similarly, in the City of Clearwater case, the court held that the passage of the ordinance for "sanitary," "aesthetic," and "stability" of the neighborhood were not enough for the general welfare of the community. In holding for the property owner, the court went on to state that if the regulatory action had invaded personal or property rights unnecessarily or unreasonably, in violation of the Florida and Federal Constitutions, then it must be equated with arbitrary and capricious action. In our view, the latter principle applies here; therefore, the property owner is not required to prove denial of all use of its property.
To add emphasis to the proposition that it is implicit that the regulatory action be taken for a valid public purpose, just the reverse was true in this case. In fact, two of the City officials, Kleingartner and Riley clearly usurped their authority as they committed illegal acts; the City Manager got involved when it was not his duty to do so; the Mayor was concerned about getting re-elected as were the other commissioners. Finally, under no circumstances can it be said that the public's health, safety and welfare were promoted by protecting the homeowners' view of the ocean and the light from the lighthouse.
While it is not necessary to prove denial of all use (for the reasons stated), Yardarm in fact was denied all use of its property. Time and time again civil actions had to be brought; they were always appealed by the City. In the court's estimation these appeals were both dilatory and frivolous. They fostered nothing but to frustrate Yardarm's purpose. Illegal acts of certain City officials caused a lawful *1384 permit to be revoked which led to a series of events which ultimately led to the loss of Yardarm's property. In this hostile atmosphere, even if Yardarm had wanted to use the property for another purpose, the City would not have allowed it.
Counsel for the City have cited the case of McNulty v. Town of Indiatlantic, 727 F. Supp. 604 [(Fla. 1989)] in support of their position that the property owner was not denied all use of his property. As in the First English case, a valid ordinance was in place for the protection of sand dunes. For this reason, McNulty can be distinguished from the facts of this case.
We[7] begin by stating the obvious  that the final judgment of a "permanent taking" based on obstructionist tactics of Pompano Beach is unorthodox for many reasons. First, Yardarm did not own the real property that it claimed the City had "taken;" it had been lost to Yardarm's lender through foreclosure. More important, it involves a claim that Pompano Beach's improper abuse of its permitting power to prevent Yardarm from building an eighteen story hotel was a "taking." Finally, Yardarm's claim depends on the notion that the City did not "take" Yardarm's property until the landowner "gave up" trying to put an eighteen story hotel on it.
The threshold question presented is whether Yardarm's claim can support a judgment for inverse condemnation. We hold that it cannot. Inverse condemnation is a cause of action in favor of a property owner against an agency having the power of eminent domain to recover the value of property that has been de facto taken, by the agency, even though no formal exercise of the power of eminent domain has been attempted. City of Jacksonville v. Schumann, 167 So.2d 95 (Fla. 1st DCA 1964), cert. denied, 172 So.2d 597 (Fla. 1965). A "taking" in Florida requires the deprivation of substantially all use of the property alleged to have been taken. Tampa-Hillsborough County Expressway Authority v. A.G.W.S. Corp., 640 So.2d 54 (Fla. 1994); Askew v. Gables-By-The-Sea, Inc., 333 So.2d 56, 61 (Fla. 1st DCA 1976), cert. denied, 345 So.2d 420 (Fla. 1977).
This is not a typical case where a public body's land use regulation has gone "too far,"[8] depriving an owner of substantially all use of his land. The lower court incorrectly ruled that a judgment for inverse condemnation could be had, even in the absence of a deprivation of substantially all use of Yardarm's property, if Pompano Beach's interference with Yardarm's plan for development were an invalid exercise of its police power. This was an understandable error given that "takings" law is one of the most confused areas in American jurisprudence. Confusion on this issue may have arisen, in part, from the notion that a valid exercise of the police power regulating the use of property can give rise to no remedy unless the landowner suffers a deprivation of substantially all use of his land. Somehow, the converse of that proposition found its way into the analysis  if not the holdings  of several appellate decisions. Confusion surely has also resulted from language used loosely in the cases.[9] Recent decisions make clear, however, that the sine qua non for inverse condemnation is a "taking"  whether a valid exercise of police power or not, whether temporary or permanent.
In Florida, any uncertainty on this point was dispelled by the supreme court in Tampa-Hillsborough County Expressway Authority, 640 So.2d at 57. In that case, a *1385 land use regulation previously had been struck down by the high court as an invalid exercise of the police power. Based on that ruling, the landowner brought an inverse condemnation action. The court held that the owner was required to prove a "taking" in order to maintain a claim for inverse condemnation, even though the regulation had been struck down as an improper exercise of the police power. Here, the lower court determined that the City's actions were "illegal," "arbitrary and capricious," "not taken to promote the public's health, safety or welfare," "frivolous," "dilatory" and a "usurpation of authority." Although speaking in terms of a "taking," the fact findings of the lower court are a classic expression of a denial of due process. Corn v. City of Lauderdale Lakes, 997 F.2d 1369, 1374 (11th Cir.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1400, 128 L.Ed.2d 73 (1994). The lower court correctly perceived that the law provides a remedy for such conduct but, unless there is a deprivation of substantially all economic, beneficial or productive use of the property, inverse condemnation is not the remedy. If an invalid exercise of police power causes damage not amounting to a "taking," the claim is for a violation of substantive due process and the remedy is monetary damages. See e.g., Eide v. Sarasota County, 908 F.2d 716, 720-722 (11th Cir.1990), cert. denied, 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991). See also Tampa-Hillsborough County v. A.G.W.S., 608 So.2d 52, 57 (Fla. 2d DCA 1992) (Altenbernd, J., dissenting).
An example of the correct legal analysis applicable to this kind of case can be found in Bello v. Walker, 840 F.2d 1124 (3d Cir.), cert. denied, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988). The plaintiff was the developer of a multi-phase housing project. It had submitted a site plan for five phases, obtained building permits for phase one and completed construction. When subsequent application was made for phase five of the project, however, the building permit was denied on the ground that the developer had failed to plan the build-out of the phases in numerical order. Evidence suggested that the town council had made the decision to deny the permit because some of the members wanted to discourage multi-unit housing and because two members of the council had personal animosity toward one of the developer's employees, who was their political rival. Eventually, the developer obtained a court order requiring the issuance of the permit.
The developer also filed suit against the City and the individual council members, asserting deprivation of due process and equal protection, pursuant to 42 U.S.C. § 1983, violation of federal antitrust laws and inverse condemnation. Summary judgment was entered in favor of all defendants on all claims and the developer appealed. The Third Circuit Court of Appeals ruled that the claim for violation of substantive due process, alleging governmental action that was arbitrary, irrational, and tainted by improper motive, including partisan, political or personal reasons unrelated to the merits of the application for the permits, would support a claim under 42 U.S.C. § 1983. Id. at 1128-29. See also Brady v. Town of Colchester, 863 F.2d 205, 215-16 (2d Cir.1988).
In contrast, the Third Circuit upheld the summary judgment in favor of the defendants on the "taking" claim, noting that the plaintiffs could not make out a claim that their property had been "taken" without just compensation because they had merely been denied a particular building permit. Because they retained the right to put their land to multiple alternative uses, the municipality's actions could not have been said to have denied them all use of their property. Id. at 1131.
Although the lower court in this case principally ruled that Yardarm need not prove a denial of all use of its land because Pompano Beach's actions were improper, the court also attempted to fit within the "takings" cases by finding that "[i]n this hostile atmosphere, even if Yardarm had wanted to use the property for another purpose, Pompano Beach would not have allowed it." This finding is simply not supported by any evidence in the record. While Yardarm's evidence may have demonstrated Pompano Beach's determined opposition to Yardarm's construction of an eighteen story hotel, there *1386 is no evidence of obstruction of any other use. Yardarm was in fact using the property for an alternative use  the restaurant  through April of 1977. There was always the ability to build a ten story building. In addition, Yardarm was in possession of a valid permit to build an eighteen story hotel on the east side from July 1981 until March 1985. No permit for the west side was ever applied for.
As alluded to in Bello, supra, in cases involving permit denials, it is usually difficult for a claimant to establish a "taking." A sister court in Oregon recently explained:
[W]ith rare exceptions, no particular denial of an application for a use can demonstrate the loss of all economic use. That is so for two reasons. First, the fact that one use is impermissible under the regulations does not necessarily mean that other economically productive uses are also precluded; and second, until alternative uses are applied for or alternative means of obtaining permission for the first use are attempted, there can be no conclusive authoritative determination of what is legally permissible by the regulations.
Nelson v. City of Lake Oswego, 126 Or. App. 416, 869 P.2d 350 (1994). See also Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 136-137, 98 S.Ct. 2646, 2665-2666, 57 L.Ed.2d 631 (1978).
Total takings based on the denial of a permit are appropriate where the evidence shows that a city intends to deny all permits for development as an indirect method of dedicating property to a public purpose. See, e.g., Vatalaro v. Department of Envtl. Regulation, 601 So.2d 1223 (Fla. 5th DCA) (holding permit denial was taking requiring compensation where language used in denying permit made it clear that only use for ecologically sensitive land was to look at it), review denied, 613 So.2d 3 (Fla. 1992).[10] A "taking" may also be found where a landowner is denied a permit for the only feasible use of the land, thereby effectively denying him or her the "economically viable" use of the land. United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) (recognizing principle); Resolution Trust Corp. v. Town of Highland Beach, 18 F.3d 1536, 1549 (11th Cir.1994) (property was "completely unusable" after lapse of PUD zoning). See also Alexander v. Town of Jupiter, 640 So.2d 79 (Fla. 4th DCA 1994) (landowner denied permit to clear land to remove trees that would permit survey.)
Even if the earlier denials of building or dock permits by Pompano Beach could have constituted a "taking" of Yardarm's property, all requested permits had been issued by 1981. The trial court made no findings concerning any further obstruction by the City. Rather, the court focused on Yardarm's inability to obtain financing after 1981 due to the City's "hostility" to the project. The inability to obtain financing may be caused by a "taking" or may be some evidence of a "taking," but it is not a taking. See Southpark Square, Ltd. v. City of Jackson, 565 F.2d 338, 343 (5th Cir.1977), cert. denied, 436 U.S. 946, 98 S.Ct. 2849, 56 L.Ed.2d 787 (1978). In Southpark, the court considered the "novel" question of "whether a city's denial of a building permit, ultimately resulting in the owner's loss of his property for inability to obtain financing, is a compensable taking." Id. at 342. The court rejected the claim, reasoning:
A city would be unduly hamstrung if its permit decision subjected it to potential liability on the basis of financial arrangements independently made by property owners affected by those decisions.
Id. at 343. As explained above, if Yardarm was placed in financial difficulty as a result of *1387 the City's prior unlawful acts, it had to pursue a damage remedy; its land had not, however, been taken by Pompano Beach.
Finally, Yardarm's alleged inability to obtain financing is not the type of negative economic impact compensable as a taking. See Highland Beach, 18 F.3d at 1536. For the period after 1981, Yardarm is not only unable to show that it was denied any particular use of its property, but it is unable to establish a negative economic impact on land value resulting from Pompano Beach's actions. The Federal Circuit Court of Appeals has recently held that the issue of negative economic impact requires consideration of the relationship of the owner's basis or investment and is measured by the change, if any, in the fair market value before and after the "taking." See Florida Rock Indus., Inc. v. United States, 18 F.3d 1560 (Fed. Cir.1994). Yardarm itself estimated that the value of its property rose from $5 million in 1981 to $6.2 million in 1985, and it rejected an offer for the property of $8 million in 1983 because it thought the offer was too low.
Also relevant to our conclusion that there was no "taking" in this case, as a matter of law, is the date this "taking" was found by the lower court to occur: the date of expiration of the City's 180 day deadline within which to reapply for a permit after the east parcel permit had lapsed for lack of work. This date is not tied to any particular act on the part of Pompano Beach; rather, it appears to represent the date Yardarm decided to (or had to) "give up." Yardarm contends that, under Florida law, the date of a "taking" is the date a landowner quits struggling against the condemning authority's confiscatory regulation. This argument, however, is merely a misapplication of the ripeness doctrine. Ripeness and persistence are not the same thing. Ripeness is required in regulatory taking cases because a court is unable to determine whether a regulation "goes too far" for purposes of a regulatory "taking" analysis until it has been determined exactly how far the regulation has gone. Ripeness does not require Yardarm to engage in years of litigation with the City. Once Yardarm had made a definite and meaningful effort to obtain City approval for its eighteen story hotel and Pompano Beach had evinced an intention not to give it, Yardarm's claim was ripe.[11] If its property were effectively "taken," Yardarm was not obliged to keep suing to invalidate the City's decision, although it was privileged to do so. If, while in force, the City's invalid actions caused a "taking," damages were available for the "temporary taking." Lucas. Here, by 1981, the permit refusal had ended and the permit was in hand.
The probable reason for the court's selection of the date of "taking" was Pompano Beach's statute of limitations defense. In rejecting this defense, the lower court relied on Askew.[12] On appeal, Pompano Beach again contends that, even if there were a permanent total "taking" in this case, this action is barred by the statute of limitations. In making this argument, Pompano Beach asserts that the applicable statute of limitations is the four year statute pertaining to either "[a]n action founded on a statutory liability," 95.11(3)(f), Fla. Stat. (1985), or the four year statute applicable to "[a]ny action not specifically provided for in these statutes." § 95.11(3)(p), Fla. Stat. (1985). Pointing out that Yardarm's permit for the east side was reinstated on July 16, 1981, and that the permit remained in effect until May 1, 1985, when it was revoked by operation of law, Pompano Beach maintains that there clearly was no "taking" in the four year *1388 period preceding Yardarm's commencement of the action and that, consequently, the action is barred.
Yardarm agrees that the appropriate statute of limitations, if any,[13] is four years, but it contends that Pompano Beach's limitations defense is "nonsensical" in that "Yardarm could not bring a taking case against Pompano Beach because it kept winning." Relying on Key Haven Associated Enterprises, Inc. v. Board of Trustees of Internal Improvement Trust Fund, 427 So.2d 153 (Fla. 1982) and Albrecht v. State, 444 So.2d 8 (Fla. 1984), Yardarm contends that a cause of action for inverse condemnation does not accrue until a property owner stops challenging the action taken by the government in opposition to development. Albrecht and Key Haven, however, really have no application to this issue and do not support Yardarm's theory. Albrecht simply stands for the proposition that, assuming a deprivation of all use of the land has already taken place, the landowner has two choices: to try to undo the taking or to seek compensation. This remains true, if incomplete, in light of First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). Now it is clear that the landowner may seek compensation for the period while there was a deprivation of use before the taking was undone. It does not mean, however, that the statute of limitations for a "taking" does not begin to run so long as the landowner opposes the agency action that has worked a "taking."
The statute of limitations issue in this case first requires consideration of when the City took any action that deprived Yardarm of substantially all use of its land. Assuming arguendo that the answer is something other than "never," it is at least clear that, on the date suit was filed, September 15, 1987, the statute of limitations had run as to any "taking" that occurred earlier than September 15, 1983. Any "taking" occurred when the permit was denied and Yardarm lost its right to develop, Vatalaro, 601 So.2d at 1229, and ended in 1981 when the permit was reissued.
The final question is whether the City took any separate action that rose to the level of a "taking" after September 15, 1983. We can find nothing in the record that would support a finding that there was a "taking" by the City after that date. Contrary to the view taken by the lower court, in this type of case, there can be no "domino effect" or "piggybacking" of all the offenses of prior years so that previous, time-barred "temporary takings" turn into a permanent taking whenever the regulatory authority takes any new action adverse to the developer and the developer decides he has had enough. If Yardarm had a "taking" claim for what happened up to July 16, 1981, it had until July 16, 1985 to bring it.
Because this case is before us on an appeal from a non-final order and because we reverse that order, the case is remanded to the lower court for further proceedings. We note that the lower court previously had entered an order granting partial summary judgment on Yardarm's due process claim brought under 42 U.S.C. § 1983 based on the City's contention that such a claim would be "premature" until the "taking" claim was disposed of. Although we express no opinion *1389 about the merits of a due process claim on this factual record, in light of our opinion, Yardarm is entitled to reconsideration of the summary disposition of this cause of action.[14]
REVERSED and REMANDED.
COBB, W., and PETERSON, E., Associate Judges, concur.
NOTES
[1] The damage issue has yet to be tried.
[2] The restaurant was consistently named one of Florida's best. In 1976-1977, its final year of operation, it grossed more than $1,000,000.
[3] Yardarm was actually able to purchase only two of the three parcels which made up the west side. It obtained a long-term lease of the third parcel, and this lease ultimately became a problem in Yardarm's attempts to obtain financing.
[4] City of Pompano Beach v. Broward County Bd. of Rules and Appeals, No. 80-145 (Fla. 4th DCA July 1, 1981) (unpublished order).
[5] City of Pompano Beach v. Yardarm Restaurant, Inc., 509 So.2d 1295 (Fla. 4th DCA 1987).
[6] A second count under 42 U.S.C. § 1983 was disposed of before trial based on Yardarm's failure to exhaust its state remedies prior to filing suit. Yardarm's federal takings claim was dismissed for the same reason.
[7] After oral argument, the entire Fourth District Court of Appeal recused itself and a panel of the Fifth District Court of Appeal was assigned by the Chief Justice to sit as the Fourth District court to decide the case. Because of the lapse of time and the pace of developments in this area of the law, the new panel allowed rebriefing and held a second oral argument.
[8] Pennsylvania Coal v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).
[9] Compare Agins v. City of Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980), with the case it relies upon, Nectow v. City of Cambridge, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928), which involved an injunction against the improper exercise of the police power. See also Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 123, 98 S.Ct. 2646, 2658, 57 L.Ed.2d 631 (1978); Nollan v. California Coastal Comm'n, 483 U.S. 825, 834 n. 3, 107 S.Ct. 3141, 3147 n. 3, 97 L.Ed.2d 677 (1987).
[10] Accord Kraft v. Malone, 313 N.W.2d 758 (N.D. 1981) (by denying building permit in city, city had effectively taken property for public park and drainage ditch); City of Austin v. Teague, 570 S.W.2d 389 (Tex. 1978) (finding taking where city denied permit specifically to preserve area as scenic easement for benefit of public and to prevent development of any kind). See also Karatinos v. Town of Juno Beach, 621 So.2d 469 (Fla. 4th DCA 1993) (finding that city was not cause of taking where city engineer testified that state would never have permitted construction of any building on property), review denied, 634 So.2d 625 (Fla.), and cert. denied, ___ U.S. ___, 114 S.Ct. 2133, 128 L.Ed.2d 864 (1994).
[11] See generally Note, Finality Ripeness in Federal Land Use Cases from Hamilton Bank to Lucas, 9 J. of Land Use & Environmental Law 101, 115-27 (Fall 1993). Yardarm itself has argued that by June 1974 it had become "obvious" that Pompano Beach had "no intention to reissue the permit to build the hotel... ."
[12] Askew is inapposite to the facts of this case, however. Although the pattern of conduct may have been similarly lengthy on the part of the state, the triggering event, which was opposition to the Corps of Engineers' extension of the landowner's dredge permit, occurred within the statute of limitations. The statute of limitations was not an issue in that case.
[13] See generally Charles C. Marvel, State Statute of Limitations Applicable to Inverse Condemnation or Similar Proceedings by Landowner to Obtain Compensation for Direct Appropriate of Land Without the Institution or Conclusion of Formal Proceedings Against Specific Owner, 26 A.L.R.4th 68 § 2 (1983). The argument that the statute of limitations is inapplicable to actions for inverse condemnation has previously been rejected by the Florida Supreme Court. See, e.g., Hillsborough County v. Kensett, 107 Fla. 237, 144 So. 393 (Fla. 1932) (actions for inverse condemnation are subject to both the statute of limitations and the doctrine of laches). This case is a good illustration of why a statute of limitations is appropriate in these types of cases; here, several of the key witnesses had died or become unavailable years before this action was brought.
[14] We find no merit in the issue on appeal pertaining to the improper use of deposition testimony. We do not reach the res judicata/collateral estoppel/law of the case issue because our decision makes it unnecessary.