834 So.2d 861 (2002)
The CITY OF POMPANO BEACH, Appellant,
v.
YARDARM RESTAURANT, INC., Appellee.
Nos. 4D99-977, 4D00-591 and 4D00-2499.
District Court of Appeal of Florida, Fourth District.
October 9, 2002.
Rehearing Denied February 4, 2003.
Henry Latimer and Caran Rothchild of Greenberg Traurig, P.A., Fort Lauderdale, for appellant.
Margaret L. Cooper of Jones, Foster, Johnston & Stubbs, P.A., West Palm Beach, and Randolph W. Adams, Fort Lauderdale, for appellee.
*862 Frank A. Shepherd, Miami, for Amicus Curiae Pacific Legal Foundation.
TAYLOR, J.
This case concerns § 1983 due process claims by a developer against a city for obstruction and delay in the issuance of building permits for construction of a hotel and marina on the developer's property. The City of Pompano Beach ("City") appeals a judgment holding it liable for violation of substantive and procedural due process rights of Yardarm Restaurant, Inc. ("Yardarm"). The City also appeals, and Yardarm cross-appeals, the award of damages, attorney's fees, and costs. We have consolidated these cases for review.
I. BACKGROUND
In City of Pompano Beach v. Yardarm Restaurant, Inc., 641 So.2d 1377 (Fla. 4th DCA 1994) ("Yardarm I"), we reversed a judgment finding the City liable for inverse condemnation of property owned by Yardarm. The judgment was based on the trial court's finding that the City's history of obstructing the issuance of Yardarm's permits for a hotel and marina effected a permanent taking of its property. In reversing, we concluded that Yardarm failed to establish a "taking," because the City did not deprive Yardarm of substantially all use of its property. Id. at 1384-87. We further ruled that any "taking" claim was barred by the statute of limitations. Id. at 1388.
We observed, however, in Yardarm I that the facts found by the trial court might support a claim for a due process violation under 42 U.S.C. § 1983. Accordingly, we remanded the case for reconsideration of the summary disposition of appellee's due process claim. Id. at 1389. We expressly declined to rule on the merits of a due process claim on the record then before us. Id. at 1389.
On remand, the trial court reinstated Yardarm's due process claim and the case proceeded to trial in 1998. The court held a non-jury trial on the issue of liability and bifurcated the damages portion. Following a two-week trial, the court found that the City violated Yardarm's procedural and substantive due process rights by its obstructionist conduct in connection with Yardarm's application for building permits. The court ruled alternatively that the City effected a federal taking of Yardarm's property. After determining that recovery was not barred by the statute of limitations because of the "continuing violation" doctrine, the court entered a liability judgment for Yardarm.
Thereafter, a jury returned a verdict assessing damages against the City in the amount of $7,601,920. The trial court later entered a final judgment for damages totaling $19,203,491, which included its calculation of pre-judgment interest through the verdict. The court also awarded attorney's fees and costs to Yardarm. The City appealed both the final judgment on damages and the attorney's fee and cost award. Yardarm cross-appealed portions of both and sought clarification on the post-judgment interest.
II. THE 1998 TRIAL
During the liability phase of the second trial, Yardarm presented numerous witnesses and exhibits to prove that the City willfully obstructed the development of its hotel project from 1973 through 1981 and that its conduct resulted in Yardarm's inability to obtain financing for its expansion plans, ultimately causing Yardarm to lose its property through foreclosure. In addition to presenting much of the evidence from the first trial, Yardarm introduced some new evidence relating to the unofficial "policy" of the Commission and secret meetings and discussions among City officials *863 about plans to repeal the special exception.
Yardarm, which was owned by James and Thomas Stephanis, had operated a successful restaurant in Pompano Beach since 1959 on the east side of its property overlooking the Hillsborough Inlet. In 1972, Yardarm decided to build an eighteen-story hotel tower and marina on this site (the "East Side"). Shortly after its plans became known, political opposition to the hotel began to mount. The Hillsboro Shores Improvement Association ("Association"), a homeowners group located on the south side of the inlet, objected to the hotel's construction because it would block their view of the ocean and the lighthouse at the inlet. The local Pompano Beach Republican Club was also an active opponent of the project.
On May 1, 1973, before Yardarm applied for a building permit for its East Side project, the City enacted an ordinance imposing a ten-story height restriction on new buildings in the city. In response, Yardarm applied for a special exception to construct its eighteen-story hotel. On October 2, 1973, the City passed Ordinance No. 73-96, which granted Yardarm a special use exception for the project. The Association vigorously opposed the special exception and filed suit to set it aside. Ultimately, the circuit court upheld the special exception, finding that the Hillsboro Shores residents had no legal right to unobstructed views of the lighthouse and inlet.
On February 8, 1974, Yardarm applied for a building permit. The Building Official, Walter C. Williams, issued the permit on February 14, 1974. However, four days later, the Building Official revoked the permit, citing noncompliance with applicable codes and regulations, failure to obtain necessary approvals from other regulatory agencies, the existence of an easement on the property, and certain deficiencies in the application and plans, including inadequate parking spaces.
Yardarm responded by filing suit against the City for re-issuance of the permit. This litigation resulted in an order that acknowledged the City's right to rescind the permit but ruled that Yardarm could apply for a new permit upon plans that complied with the building and zoning laws in effect on February 14, 1974, the date the permit was originally issued, together with approvals from the regulatory agencies required by the City at that time.
In February 1977, after the City denied Yardarm's re-application for a building permit because of inadequate parking spaces, Yardarm sought supplemental relief from the circuit court. The court ruled in Yardarm's favor, reiterating that the "February 14, 1974 regulations apply." On March 15, 1977, the day following the court's ruling, Yardarm was issued a new building permit.
In April 1977, having finally resolved the parking issues and obtained the permit for its hotel, Yardarm closed its restaurant and demolished the building. At the time, the restaurant was free and clear of any encumbrances or mortgages and had just experienced its most profitable year. Though Yardarm needed permanent financing to build the East Side project, it proceeded with preliminary site work.
Soon thereafter, Yardarm became aware that its new permit issued in 1977 did not include the seawall, dock, and quays that had been included in the former, revoked permit. Yardarm continued site preparation while filing for approval of the seawall and docks. The City ultimately approved the seawall, but refused a permit for the docks, as did the board of appeals. In January 1978 Yardarm sought supplemental relief from the circuit court. Almost a *864 year later, following trial, the parties stipulated to an order which permitted Yardarm to build a dock and directed the City to give the Corps of Engineers any required written assurances. However, when Yardarm sought approval from the Corps of Engineers for construction of the dock, the City Manager wrote the Corps opposing the dock permit and demanding a public hearing if the Corps was undecided on the matter.
The Corps eventually issued the dock permit. However, in July 1979, while the matter was still pending, the City determined that Yardarm's building permit had lapsed because there had been no construction on the site for ninety days. This determination was based on a recently enacted rule that litigation between the parties would not toll work requirements. Yardarm went to court, again contending that the applicable rules were those in place in 1974, when it first applied for a permit. Ultimately, in July 1981, after an appeal to this court, the Yardarm's permit was reissued.[1]
In the meantime, construction costs increased dramatically from $5 million to over $9 million. Hoping to make the project more attractive to institutional lenders and obtain a management contract with a major hotel chain, Yardarm decided to expand the project. In February 1981, Yardarm purchased a second parcel, west of the property Yardarm already owned (the "West Side"). To finance this additional land, Yardarm mortgaged the East Side parcel. Yardarm then abandoned the East Side project and redrew plans for a completely different hotel project on both the East and West Sides (the "East/West Project").
Yardarm sought financing for the expanded project. One potential deal turned out to be a scam that cost Yardarm $205,000. Because Yardarm had been required to take on a partner, it continued to seek a loan which would fully compensate it up front for the value of property and its costsa total of about $6 million. Yardarm received two substantial offers to buy its stock in 1983: one for $4.25 million and one for approximately $8 million. Yardarm rejected the first offer, and the second offer was withdrawn when the offeror discovered that Yardarm had given someone else an option to buy the property. Meanwhile, to fund enough construction on the existing project to prevent the permit from lapsing, Yardarm took out a number of short term loans. The last of these was a $2.8 million loan obtained in January 1984 from Sunrise Savings and Loan Association.
During this time, Yardarm obtained "B-2" plan approvals from the City's Planning Department for the West Side project from 1981 through 1984. However, Yardarm never took the next step of applying for a building permit for the West Side before Sunrise filed for foreclosure on May 8, 1985. The foreclosure proceedings caused the work to stop, and the permit for the East Side project lapsed due to lack of progress. The Building Official informed Yardarm that it could get the permit reinstated if it re-filed plans within 180 days, or by October 30, 1985. Rather than apply for reinstatement of the permit, Yardarm submitted new plans for preliminary site plan review of its East/West project.
Around the time that the building permits for the East Side project elapsed, the City began to consider repealing the ordinance *865 which granted Yardarm the special use exception to build its 18-story hotel. The ordinance was given its first reading on September 3, 1985. A second reading was scheduled for October 29, 1985. On October 10, 1985, Yardarm submitted a consolidated plan for a project on both the old and the new parcels. When it learned of the prospective repeal of the special exception ordinance, and with the deadline for permit reinstatement about to run, Yardarm filed suit for an injunction against the repeal. The injunction was granted on November 20, 1985.
The City appealed from the injunction. In July 1987, we ruled in favor of the City in its appeal from the order enjoining it from repealing the eighteen-story ordinance. City of Pompano Beach v. Yardarm Restaurant, Inc. 509 So.2d 1295 (Fla. 4th DCA 1987). We held, inter alia, that the City was not estopped from revoking the ordinance, notwithstanding the City's purported obstructionist tactics, because Yardarm had failed to make any real effort to construct the building during the period following cessation of any obstructionist activity. Id. at 1297.
By February 26, 1986, when Yardarm received tentative approval for its consolidated plan on both parcels, a final judgment of foreclosure had already been entered on the properties. A foreclosure sale was set for March 21, 1986. On March 4, 1986, the City gave Yardarm site approval, with 180 days to obtain a building permit. Yardarm filed for bankruptcy protection. The bankruptcy stay was subsequently lifted and the property was sold in foreclosure to FSLIC, as receiver for Sunrise. Years later, the City purchased the land from FSLIC at auction.
III. FEDERAL TAKINGS CLAIM
In addition to trying appellee's § 1983 due process claims at the 1998 trial, the trial court reinstated the federal takings claim.[2] In Yardarm I, we had reversed the trial court's finding that the City, through its conduct in obstructing the issuance of Yardarm's permit, had effected a permanent taking of Yardarm's property under the state constitution. 641 So.2d at 1387. We ruled that the facts did not support a takings claim because Yardarm was not deprived of substantially all use of its property. Id. at 1384-86.
Our holding, in addition to being the law of the case with respect to the state law takings claim, was issue preclusion, or res judicata, on Yardarm's federal takings claim under the United States Constitution and § 1983. Because this claim is identical to the state claim previously adjudicated by this court, the trial court erred in concluding that a taking had occurred. See Brunner Enters., Inc. v. Dep't. of Revenue, 452 So.2d 550, 552 (Fla.1984)(citing Greene v. Massey, 384 So.2d 24 (Fla.1980)(discussing that, except in extraordinary circumstances, all questions of law which have been decided by the highest appellate court become the law of the case, which must be followed in subsequent proceedings)); see also Treister v. City of Miami, 893 F.Supp. 1057, 1067 (S.D.Fla.1992)("We have no doubt that the issues raised by a claim for a taking, and the elements of the claim, under the Florida Constitution, are sufficiently similar to the parallel claim under the United States Constitution so as to constitute identical claim for res judicata purposes, and that the issues necessarily litigated therein are *866 sufficiently identical for issue preclusion purposes.").
IV. PROCEDURAL DUE PROCESS
The trial court concluded that the City's actions in delaying and obstructing Yardarm's attempts to obtain building permits violated both Yardarm's procedural and substantive due process rights. The City urges reversal of the ruling with respect to procedural due process, contending that the 1998 trial proceeded only on Yardarm's substantive due process claim. The City points out that in the eleven-year history of this case, Yardarm never asserted a procedural due process claim in any of its pleadings, nor litigated a procedural due process claim during the trial.[3] The City further argues that even if a procedural due process claim had been properly pled or tried, such claim should still fail because: (1) Yardarm was not deprived of any property right; and (2) even if it had been, the City provided Yardarm with all the process it was due.
Yardarm responds that it is irrelevant that it failed to use the words "procedural due process" in its pleading or at trial; that evidence of the City's actions on its building permits without advance notice or hearing, pattern of dilatory litigation, and secret discussions on repeal of its special use exception established procedural due process violations. We disagree.
As the trial court recognized, procedural due process prevents the government from depriving a person of a significant property interest without due process of law. See First Assembly of God of Naples, Fla., Inc. v. Collier County, 20 F.3d 419, 422 (11th Cir.1994). Here, Yardarm has not shown any procedural due process violations. With respect to actions taken by the Building Official on Yardarm's building permit applications, Yardarm was afforded, and actually utilized, full judicial procedures to challenge these administrative decisions. See, e.g., Boatman v. Town of Oakland, 76 F.3d 341 (11th Cir.1996) (holding that property owners' civil rights action against a town for its refusal to issue them a certificate of occupancy did not fall under the procedural component of § 1983 because the state provided them all the process they were due, i.e., the right to repair to the circuit court and seek an order compelling a final inspection).
With respect to the City's attempts to repeal Yardarm's special use exception, Yardarm could and did seek an injunction in the circuit court. Moreover, since the ordinance to repeal the special exception was never actually enacted, Yardarm's special exception was never repealed. Hence, assuming, for the sake of argument, that Yardarm had an interest in the special exception, it was never deprived of it.
V. SUBSTANTIVE DUE PROCESS
Yardarm's substantive due process claim under § 1983 is predicated upon its claim of a vested property right in the building permits that the City improperly withheld, revoked, and delayed. Essentially, Yardarm asserts a constitutionally protected property right in the building *867 permits arising from its change of position or expenditure of large sums of money in reliance on them and based on its position that the City lacked discretion to deny the permits. The trial court agreed that Yardarm had a federally protected interest in the building permits and found that the City acted arbitrarily and in bad faith for political and personal reasons in the permitting process. Based on these findings, the court concluded that Yardarm's substantive due process rights were violated and entered judgment for Yardarm.
The City seeks reversal of the judgment, arguing that Yardarm had no substantive due process protection in its building permits.[4] The City asserts that Yardarm's purported property rights in these permits, even if vested, were state created property rights, which do not enjoy substantive due process protection under § 1983. It points out that the cases mainly relied upon by Yardarm and the trial court, Reserve, Ltd. v. Town of Longboat Key, 17 F.3d 1374 (11th Cir.1994), and Corn v. City of Lauderdale Lakes, 771 F.Supp. 1557 (S.D.Fla.1991), are no longer good law, having been overturned by McKinney v. Pate, 20 F.3d 1550 (11th Cir.1994)(en banc), cert. denied, 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995), and Sullivan Prop., Inc. v. The City of Winter Springs, 899 F.Supp. 587 (M.D.Fla.1995).
In the Reserve case, the developer sued the Town of Longboat Key for revoking its building permit. On remand from the Eleventh Circuit Court of Appeals, the federal district court granted the town's motions for summary judgment as to the developer's substantive due process claims. The court referred to the Eleventh Circuit's holding in McKinney v. Pate, stating:
Attempting to correct our circuit's jurisprudence regarding the Fourteenth Amendment's Due Process Clause, McKinney holds that Section 1983 substantive due process claims arising from non-legislative deprivations of state-created property interests are no longer cognizable. Contrary to the plaintiffs' suggestion, the effect of McKinney extends beyond employment disputes. At least one other district court has applied McKinney to a substantive due process claim involving a building permit....
First, the purported property interest (i.e., Reserve's interest in the revoked building permit) is created by state law and falls comfortably short of a fundamental right ... Second, both the issuance and revocation of the building permit constitute "executive" and not "legislative" acts. Whether rendered by Longboat Key's legislative body or executive branch (e.g. its public works director and town manager), both decisions affect only a small group of individuals and not the general population. Accordingly, McKinney precludes Reserve's asserting a substantive due process *868 claim based on the revocation of its building permit.
Reserve, 933 F.Supp. 1040, 1043-44 (M.D.Fla.1996) (footnotes and citations omitted).
In McKinney, which involved a wrongful termination case brought by an employee against a public employer, the Eleventh Circuit distinguished between procedural and substantive due process claims in the context of state-created rights and clarified that:
The substantive component of the Due Process Clause protects those rights that are "fundamental," that is, rights that are "implicit in the concept of ordered liberty"... [A]reas in which substantive rights are created only by state law ... are not subject to substantive due process protection under the Due Process Clause because "substantive due process rights are created only by the Constitution." As a result, these state law based rights constitutionally may be rescinded so long as the elements of procedural-not substantivedue process are observed.
20 F.3d at 1556 (quoting Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937), and Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 229, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985)) (citations omitted).
Other courts have also extended McKinney beyond employment disputes and applied it in land use cases.[5] However, in this case, the trial court found McKinney inapplicable. In its Judgment Determining Liability, the court wrote that the "rights involved in this case are more fundamental than mere employment interests." Further, the court rejected the City's position that the acts Yardarm complained of were "executive," rather than legislative. The court distinguished this case from those involving "run-of-the-mill" administrative acts and ruled that this case involved legislative acts, "egregious and deliberate acts orchestrated by members of the highest legislative body of the city, under extreme circumstances involving bad faith and institutional bias."
Specifically, the court determined that the City engaged in unreasonable, protracted litigation; repeatedly ignored court orders to apply the February 14, 1974 regulations to Yardarm's permit applications; and engaged in stonewalling tactics to block the Yardarm project. The court set out in detail the actions taken by various City officials and employees on Yardarm's building permits and special exception. In concluding that these actions represented an official policy, custom, or practice of the City, the court noted the testimony of a City Commissioner, Emma Lou Olsen, that, several commissioners had an "unstated policy to kill the Yardarm *869 project."[6] In addition, the court referred to testimony concerning secret meetings between two commissioners held on Sunday mornings to discuss Yardarm, testimony that certain City officials directed and/or interfered with the activities of the Building Official, and interoffice memos between non-elected City officials concerning plans to repeal the 18-story special exception.
The City argues that, even assuming that these acts occurred, the substantive due process claim fails as a matter of law, because no evidence was presented that the acts were done in a legislative, rather than an executive capacity.
According to McKinney, the distinction between "legislative" and "executive" acts is key in the substantive due process analysis. McKinney explained that substantive due process protects against arbitrary legislative action, not arbitrary executive action. See Williams v. Goldsmith, 905 F.Supp. 996, 1000 (M.D.Ala.1995). It observed that executive acts characteristically apply to a limited number of persons often to just one personand typically arise from the ministerial or administrative activities of members of the executive branch, whereas "legislative acts" generally apply to a larger segment of society, if not to the entire society. McKinney, 20 F.3d at 1557 n. 9.
For Yardarm to prevail under McKinney on its substantive due process claim under 42 U.S.C. § 1983, it had to show that the governmental activities in this case constituted "legislative" conduct. Based on our review of the record, we conclude that Yardarm failed to establish that the acts for which it claimed damages were legislative, rather than executive acts. The evidence shows that these acts were done by various City employees and administrators applying existing rules and ordinances specifically to Yardarm, not by the Commission as a body enacting legislation and policy decisions affecting the general public.[7]See Reserve, 933 F.Supp. at 1043-44 (concluding that whether rendered by a legislative body or the executive branch, e.g., a public works director and city manager, decisions affecting only a small group of individuals and not the general population constitute executive and not legislative acts). Yardarm did not present any evidence that the City Commission or a City official with "final policy-making authority" acted against Yardarm, and that such action was taken pursuant to a policy adopted by the City Commission.[8]
*870 The acts complained of consisted of delays in issuing building permits, wrongful revocation of building permits, delays in B-2 Reviews, and an attempted repeal of a special exception. The record is devoid of any evidence that adverse actions taken on Yardarm's permits by the administrative officials, such as the Building Official, City Manager, and other department heads and employees, were directed or required approval by the City Commission. See Reserve, 933 F.Supp. at 1043-44 (M.D.Fla. 1996)("[B]oth the issuance and revocation of the building permit constitute `executive' and not `legislative' acts."); Raben-Pastal v. City of Coconut Creek, 573 So.2d 298 (Fla.1990)(holding that building official did not possess the type of policy-making authority that would make city liable under 42 U.S.C.A. § 1983 for his decision on stop work order on developer's project). Further, the record does not show that the Commission as a body adopted any official policy, custom, rule, resolution, or ordinance opposing Yardarm or made a final vote on any permit, site plan, or variance concerning the Yardarm property. In fact, the only land-use decision which the City Commission ever made as a body with respect to Yardarm's project was the granting of the special exception, which made the project possible.
VI. CONCLUSION
In sum, Yardarm may not recover for damages under its federal substantive due process claim that the City denied or delayed its building permits for improper reasons. Applying McKinney to the facts of this case, we conclude, as a matter of law, that the developer had no cognizable substantive due process claim because its property interest in the building permits was created by state law, not the Constitution, and both the issuance and revocation of the building permits constituted executive and not legislative acts. Further, as discussed above, Yardarm received such procedural due process as was due. Accordingly, we reverse the Judgment Determining Liability in its entirety, rendering the appeal and cross-appeal on damages, attorney's fees, and costs moot. We remand with instructions to enter judgment in favor of the City of Pompano Beach.
REVERSED AND REMANDED.
STEVENSON, J., and OWEN, WILLIAM C., JR., Senior Judge, concur.
NOTES
[1] This permit remained in effect well into 1985, until it again lapsed due to lack of progress.
[2] A footnote in the Liability Determining Judgment stated the judge's belief that the facts presented at trial supported judgment for Yardarm not only on its due process claims, but also on the takings claim, as alternative relief, based upon principles not addressed by our court in Yardarm I.
[3] When the § 1983 claim was reinstated, counsel for Yardarm stated in open court: "Count II. That's what we're here on ... substantive due process ... under 1983 ... this is substantive due process ... what we've got is not a taking." Then at the pretrial conference, just two months before the 1998 trial, the trial court confirmed that "[Yardarm]'s going to proceed on the theory of breach of substantive due process.... As encompassed in 42 U.S.[C.] 1983. Yardarm does not dispute the City's charge that in the 3,153 pages of transcript covering the ten days of trial and numerous arguments of counsel, there is no mention whatsoever of "procedural due process."
[4] The City disputes that Yardarm legally had any vested rights in its building permits, noting that "Florida law since 1945 had been clear that [p]ossession of a building permit does not create a vested right ..." City of Boynton Beach v. Carroll, 272 So.2d 171, 173 (Fla. 4th DCA 1973). It further argues that Yardarm did not have a vested right factually, because we found that the record does not "demonstrate such a change in position as to justify the application of equitable estoppel in this case." City of Pompano Beach v. Yardarm Restaurant, Inc., 509 So.2d 1295, 1298 (Fla. 4th DCA 1987). Finally, the City asserts that, assuming arguendo that Yardarm had a vested right in its permit, the record demonstrated that it abandoned any such right. Id. at 1297 (finding that the City's alleged obstructionist activities ceased after July 1979, and Yardarm failed to make any real progress on construction of the hotel in the intervening years).
[5] See Baggs v. City of S. Pasadena, 947 F.Supp. 1580 (M.D.Fla.1996); Jacobi v. City of Miami Beach, 678 So.2d 1365, 1366-67 (Fla. 3d DCA 1996); Kantner v. Martin County, 929 F.Supp. 1482, 1486-87 (S.D.Fla.1996), aff'd, 142 F.3d 1283 (11th Cir.1998); and Boatman v. Town of Oakland, 76 F.3d 341 (11th Cir.1996); see also Ammons v. Okeechobee County, 710 So.2d 641, 645 (Fla. 4th DCA 1998) (applying McKinney and holding that a decision to revoke an unlawfully issued occupational license did not strike at fundamental rights under the constitution and thus did not violate substantive due process rights under § 1983); Paedae v. Escambia County, 709 So.2d 575 (Fla. 1st DCA 1998) (applying McKinney and holding that the interpretation of the zoning code which disallowed the use of appellants' property in one particular manner was not a legislative action, but rather in the nature of a denial of a development permit, which would not support a federal action for damages under § 1983 because a property owner has no protectable property interest in a building permit under Florida law).
[6] Olsen testified that several commissioners made derogatory remarks about Yardarm in private conversations outside of City Commission meetings and seemed to have "a policy of stopping anything that Yardarm was doing."
[7] Yardarm's first permit was revoked in 1974 by Walter C. Williams, Building Official, as instructed by John Cartwright, the City Manager, chief executive officer and head of the administrative branch of the City government. Williams also revoked a second permit due to lack of work on the project. Subsequent reviews of Yardarm's building permit applications were done by Williams' successor, Eugene Guydosik, Fred Peterson, Assistant Planning Director, Fred Kleingartner, Planning Director, and Regan Yarbrough of the Planning Department and Planning and advisor to the Planning and Zoning Board. The City Engineer, Richard Mills, rendered advice concerning application for the dock permit. The City Attorney and City Manager were involved in matters concerning the drafting of an ordinance to repeal Yardarm's special exception.
[8] The City presented evidence that, under the City Charter, "all powers of the city and the determination of all matters of policy [are] vested [solely] in the Commission." § 10, City Charter. Thus, only the City Commission can set policy, and it can do so only through a duly enacted ordinance or resolution. In Florida, an ordinance is the "official legislative action of a governing body, which action is a regulation of a general and permanent nature and enforceable as a local law." § 166.041(1)(a), Fla. Stat. (1983).