333 So.2d 56 (1976)
Reubin O'D. ASKEW, Governor of the State of Florida, et al., Appellants,
v.
GABLES-BY-THE-SEA, INC., a Florida Corporation, Appellee.
No. Z-92.
District Court of Appeal of Florida, First District.
June 3, 1976.
*57 Ross A. McVoy, Dept. of Environmental Regulation, Tallahassee, Robert L. Shevin, Atty. Gen., and Kenneth F. Hoffman, Asst. Atty. Gen., for appellants.
Marion E. Sibley of Sibley, Giblin, Levenson & Ward, Miami Beach, for appellee.
PER CURIAM.
This controversy between appellee and the State has suffered an extensive judicial journey. In entering the partial summary judgment in favor of appellee, Gables-By-The-Sea, Inc., the learned trial judge traced the trials and tribulations that appellee has suffered for more than a decade by the actions of the sovereign. We adopt as this court's opinion the trial court's Partial Summary Judgment, viz.
"... The Court has examined the pleadings of the parties and the depositions and exhibits attached of Bernard Barnes of the Department of Pollution Control; Harmon W. Shields, Executive Director of the Florida Department of Natural Resources; Joseph W. Landers, Jr., of the Florida Board of Trustees of the Internal Improvement Trust Fund; Dr. O.E. Frye, Jr., Executive Director of the Department of Game and Fresh Water Fish Commission; and Bernard E. Goods, Chief of the Regulatory Branch of the U.S. Corps of Engineers, Jacksonville District. The Court has also considered the final judgment rendered in this cause on the 10th day of September, 1970; the supplemental final judgment rendered in this cause on January 21, 1972; and the opinions and judgments in this cause rendered by the District Court of Appeal of Florida, First District; namely, Kirk, Governor of State of Florida et al. v. Gables By The Sea, Inc., 251 So.2d 880, and Askew, Governor of State of Florida et al. v. Gables By The Sea, Inc., 258 So.2d 822. Based thereon the Court finds that:
"1. In the Judgment of this Court on the 10th day of September, 1970, it was finally adjudicated: [Defendants are appellants here and Plaintiff is appellee.]
`On January 6, 1936, plaintiff acquired by purchase from the Trustees of the Internal Improvement Fund a substantial tract of bottoms in Biscayne Bay and within the City of Coral Gables. This tract extended seaward to the then established bulkhead line.
`Some time after the purchase of these bottoms, the bulkhead line was reestablished some distance seaward from its previous location.
`In 1956 plaintiff began to seek the necessary permits to dredge from the adjacent public bottoms and fill its land. Under date of May 17, 1956, the Trustees agreed to the issuance by the U.S. Corps of Engineers of a permit for this dredging. Everyone concerned seems to have regarded this as, at least, a license to plaintiff to remove the fill from the public bottoms.
`During 1957 plaintiff sought to acquire by purchase from the Trustees a parcel of bottoms consisting of the area between the bulkhead line as it had previously existed and the new bulkhead line which had been established somewhat seaward from the old line.
......
`Plaintiff filed a formal application with the Trustees, accompanied by a map which indicated the bottoms to be acquired, the areas to be filled and areas from *58 which the proposed fill was to be dredged. This map clearly indicates that the area to be filled embraced the parcel previously acquired and the proposed new acquisition.
......
`Under date of September 25, 1967, in the light of this background plaintiff purchased and paid for the second parcel of bottoms  that lying between the old and the new bulkhead lines.
......
`... prior to October 18, 1965 the City of Coral Gables approved a fill permit to plaintiff and on November 2, 1965, this permit was formally approved by the Trustees. It is also admitted that this permit was extended until December 31, 1968.
......
`The extension of the fill permit took the form of an approval by the Trustees of an extension of a permit issued by the Corps of Engineers.
......
`On May 21, 1968, the Trustees adopted a resolution prohibiting any person from thereafter dredging pursuant to any pre-existing permit unless dredging operations had already commenced. Plaintiff respected this resolution and, not having begun dredging, did not thereafter attempt to dredge under its permit.'
In that judgment it was adjudicated:
`1. The right of plaintiff under the circumstances of this case to dredge fill material from public bottoms to fill the submerged land purchased from the Trustees was an incident to the purchase of submerged land and became a vested right.
`2. This right did not extend in perpetuam and would be lost if not exercised within a reasonable time.
`3. A reasonable time does not extend beyond the expiration date of the last extension granted by the Trustees.
`4. The granting of dredge and fill permits by the Trustees served to perpetuate the rights of plaintiff for the life of such permits.
`5. The action of the Trustees in attempting to abrogate an extension of a fill permit previously granted was without lawful authority, and void.
`6. Plaintiff should not be penalized for obeying the demands of the highest officers of the State and respecting the order not to dredge.
`7. Plaintiff is entitled to dredge from the designated areas under the terms and conditions of its permit in effect on May 21, 1968, for a number of days after this judgment becomes final, and the time for appeal expires, equal to the number of days from the adoption of the above-described resolution of the Trustees to December 31, 1968.
......
`If such filling would injure the aquatic life of the vicinity to such an extent as to adversely affect the public interest, the State has the power of eminent domain to take, for just compensation, the plaintiff's property. But the State cannot, after selling submerged land to private owners, deny such owners the right to use those lands in the only way in which private ownership can be of any value.'
And the Court found:
`The plaintiff has the lawful right to dredge material from the areas indicated on the application for a dredge and fill permit and to use such material to fill its privately owned submerged land indicated on such application for a period of time consisting of 223 days beginning on the day this judgment becomes final by the expiration of the time of appeal, or the filing of the mandate of an Appellate Court affirming this judgment, whichever is the later date.'
*59 "2. The permit granted by the U.S. Army Corps of Engineers which permitted the Plaintiff to dredge and fill the land involved was not revoked and remained outstanding and valid until the date of its expiration on December 31, 1968. The Defendants, by the revocation of the state permit, were the direct cause of the expiration of the federal permit, and thus, prevented the Plaintiff from dredging and filling its property pursuant to said federal permit.
"3. In the supplemental judgment rendered on the 16th day of February, 1972, upon the prior issuance of the Rule Nisi directed to the Board of Air and Water Pollution Control, Department of Air and Water Pollution Control for the State of Florida, it was found that:
`In the last analysis the issues involved are between the plaintiff on the one hand and the State of Florida, acting through its agencies, on the other. Though the Trustees of the Internal Improvement Fund and the Board of Air and Water Pollution Control and the Department of Air and Water Pollution Control are separate and distinct agencies of the State, they are nevertheless mere agencies of the State and the question before this Court is not whether the actions of one may be the actions of another but whether or not the State is bound by the results of litigation involving one of such agencies.'
"4. In an effort to overturn this adjudication the Board of Air and Water Pollution Control of the Department of Air and Water Pollution Control took an appeal to the District Court of Appeal of Florida, First District, and the District Court of Appeal of Florida, First District, held:
`It is the conclusion of this Court that the appeal herein is dilatory in nature, is sought by appellants for the sole purpose of further frustrating and delaying compliance with the mandate of this Court and the final judgment of the trial court, is frivolous, and not taken in good faith. This Court does hereby conclude that the final judgment entered by the trial court is an appropriate order rendered in strict compliance with the mandate of this Court.'
"5. The Plaintiff, through the due course of law, was not able to procure the issuance of a permit from the Defendants until June 19, 1972. This permit granted to the Plaintiff a 223-day period to dredge and fill its land from the date of the issuance of an extension to the U.S. Corps of Engineers' permit, which had expired, as above pointed out.
"6. On May 30, 1972, the Corps of Engineers had advised the Plaintiff: ...
`Since the Department of the Army permit for this work expired 31 December 1968 no further work should be performed until the permit has been revived and extended.'
Pursuant to this notification the Plaintiff on July 28, 1972, filed its application for a revival and extension of the permit. Attached to the application was the permit issued by the Board of Trustees of the Internal Improvement Trust Fund, and the application filed by the Plaintiff with the Corps of Engineers provided: ...
`Dredging must be completed within a period of 223 days after issuance of final Corps of Engineers permit in accordance with Florida Internal Improvement Fund Permit.'
"7. The Corps of Engineers on August 17, 1972, sent out notice to state agencies and other persons advising of the application made by the Plaintiff for the extension of its permit for the said 223-day period, and requested comments for approval or objections to the issuance of the extension. On August 23, 1972, a report was made to the Director of the Board of Trustees of the Internal Improvement Trust Fund received by that Director on August *60 28, 1972, from the divisions controlled by the Defendants; namely, the Division of Interior Resources, the Bureau of Beaches and Shores and Survey and Management Section of the Department of Natural Resources in which these divisions make the following comment: ...
`This is in response to your request for comments relative to the above-captioned Corps of Engineers notice.
`The Division of Interior Resources does object to the issuance of the referenced item... .
`The Bureau of Beaches and Shores does not object to the issuance of the referenced item.
`The Survey and Management Section objects to the issuance of the referenced item... .'
"8. The Trustees of the Internal Improvement Trust Fund on September 12, 1972, through their Executive Director, advised the Corps that it would be inappropriate for the Trustees to comment `inasmuch as we are under a court order to grant a permit.' ... However, the Trustees attached to their letter a report made to the Trustees on August 30, 1972, from the Department of Natural Resources, above referred to, together with the attached comments of said division of said department, one of which was a letter of August 6, 1969, from the then Florida Board of Conservation, now the Department of Natural Resources, in which the marine biologist from said Board of Conservation makes findings of the damage and injury that will occur to the environment and to the ecology if the dredge and fill permit is granted and in which its Chief of Survey and Management states: ...
`This massive dredge and fill project will have definite and permanent adverse effects on marine biological resources.'
Also attached to said letter of the Trustees to the Corps was the attached report of the Department of Natural Resources, the Division of Interior Resources, in which that department finds `that the construction, if permitted, would dredge an area and open that ares [sic] to intrusion by sea-water almost to the saltwater intrusion line.' It also finds that the aquifer will be damaged `through the misuse of land and resources available.' ...
"9. The Florida Game and Fresh Water Fish Commission filed a vigorous protest with the Corps to the extension of Plaintiff's permit. In said protest the said commission contended that the extension of the dredge and fill permit would cause serious injury and damage to the ecology and environment and ecosystem.
"10. The Pollution Board did not itself file a protest, however, a member of the Pollution Control Board, James F. Redford, Jr., in the name of the Izaak Walton League, did protest. In this protest he pointed out that the Court had ordered a certification by the Florida Pollution Control Board without affording the department an opportunity to study the project. He further stated: ...
`If the Corps should deny such a hearing and issue a permit to Gables-By-The-Sea, I can assure you of a lawsuit against the Corps of Engineers by the Izaak Walton League, Tropical Audubon Society, Florida Audubon Society, Sierra Club, and by property owners in the subdivision involved.'
He refers to `the strange and convoluted history of this project.' The Attorney General advised Redford in connection with the application before the Corps of Engineers as follows: ...
`Although I will prepare a more extensive memorandum for the Board's consideration, it is my initial feeling that in view of the past court orders in this case, it would be best for the board not to attempt *61 to interfere with the certification by a declaratory action in federal court. I think the matter would best be solved by a private plaintiff or by the Corps' own analysis of the project.'
"11. David B. Harris of the Environmental Protection Section of the Florida Game and Fresh Water Fish Commission (See § 20.25(17), F.S.), September 11, 1972, advised the property owners engaged in protesting the issuance of the Corps' permit as follows: ...
`To bring pressure on the "Corps" I would recommend that you start a massive letter writing campaign to the District Engineer. This tactic has proved very successful in the past and I believe it would be effective in this case.'
The Corps of Engineers on November 22, 1972, sought permission to deny the application, and, thereafter, on January 18, 1973, denied said application, giving as its reasons that it is not consistent with current public interest, would destroy a biologically productive area, and was opposed by federal agencies, `the State of Florida Game and Fresh Water Fish Commission and Department of Natural Resources, the Dade County Planning Department, and was the subject of over 500 letters of opposition from the general public.' ...
"12. The motion for summary judgment presents two issues. First, whether the Plaintiff is entitled to a mandatory injunction requiring the Defendants to institute condemnation proceedings. Second, whether the Court can award damages or a compensatory fine against the Defendants for having joined in the effort to procure from the Corps of Engineers a denial of this permit. Turning first to the question of whether or not the Plaintiff is entitled to a mandatory injunction, this Court has found in the final judgment rendered on the 10th day of September, 1970, the state cannot `after selling submerged land to private owners deny such owners the right to use those lands in the only way in which private ownership can be of any value.' The Court has also held that the action of the Trustees in revoking the permit thus denying the Plaintiff the right to use its land in the only way in which private ownership can be of any value rendered the land totally useless so far as the Plaintiff, as a private owner, is concerned. This unlawful revocation of the Plaintiff's permit ultimately resulted in the denial to the Plaintiff of the right to use its land for private purposes. The unlawful action of the Defendants caused the valid permit issued to the Plaintiff by the Corps of Engineers to expire. The long delay due to the Defendant's [sic] determination to deny the Plaintiff the use of its land by utilizing every court process to delay the granting of a permit not only caused the loss by expiration of the Army permit but surely was a contributing factor in the Corps' refusal to grant an extension, for there is no contention that the permit granted by the Corps in 1965, which did not expire until December 31, 1968, would have caused any different, supposed ecological injury than it is now contended would be suffered through the extension of the said permit for 223 days.
"The Court concludes that the Defendants have permanently denied to the Plaintiff the use of its land and the Plaintiff is entitled to a judgment requiring the Defendants to institute condemnation proceedings in Dade County, Florida, pursuant to the provisions of law governing such actions.
"The Court finds from the pleadings, depositions, and admissions, all on file, together with the affidavits of the parties, that there is no genuine issue as to any material fact, and the Plaintiff is entitled to a judgment as a matter of law on the issue and prayer for the rendition of a mandatory injunction against the Defendants requiring the Defendants to institute and maintain condemnation proceedings against the property of the Plaintiff shown *62 and described in the permit granted by the Defendants on June 19, 1972.
"13. Turning to the issues of whether or not damages should be awarded to Plaintiff for costs and expenses to which it has been put due to the actions of the state agencies and officials involved, the Court deems that no such right has been established and, even if it had, the extent of the alleged damages have not been shown. The right to just compensation through eminent domain proceedings is the only relief to which the plaintiffs are entitled.
"It is thereupon,
"CONSIDERED, ORDERED AND ADJUDGED:
"A. A mandatory permanent injunction is hereby granted against the Defendants, the Board of Trustees of the Internal Improvement Trust Fund, enjoining, requiring and commanding the said state agency to forthwith institute condemnation proceedings in Dade County, Florida condemning, pursuant to the applicable statutes, the Plaintiff's property involved in this litigation, for which it shall in said condemnation proceedings pay such just compensation as may be awarded together with reasonable attorneys fees as may be allowed to the Plaintiff's attorneys in said condemnation proceedings, as is provided by law.
"B. Summary judgment is denied on the claim for assessment of damages for costs and expenses.
"C. Jurisdiction is reserved to enforce the injunction herein granted... ."
AFFIRMED.
RAWLS, Acting C.J., and McCORD and MILLS, JJ., concur.