914 P.2d 1180 (1996)
81 Wash.App. 353
VENTURES NORTHWEST LIMITED PARTNERSHIP, a Washington limited partnership, Appellant,
v.
STATE of Washington and Kitsap County, Respondents.
Irvin L. PARKHURST and Geraldine Parkhurst, husband and wife, Appellants,
v.
STATE of Washington and Kitsap County, Respondents.
No. 17893-1-II.
Court of Appeals of Washington, Division 2.
March 8, 1996.
Publication Ordered April 19, 1996.
*1182 Bruce A. Buskirk, Law Offices of Bruce A. Buskirk, Bremerton, for appellants.
*1183 Millard Joseph Sloan, Asst. Atty. Gen., Olympia, Douglas Baum Fortner, Port Orchard, for respondents.
*1181 SEINFELD, Chief Judge.
Ventures Northwest Limited Partnership and Irvin and Geraldine Parkhurst appeal from an order on summary judgment that dismissed their takings claims against the State of Washington and Kitsap County. Specifically, they allege that the defendants' regulations resulted in an unconstitutional taking of their property and a violation of 42 U.S.C. § 1983. They also contend that the County acted in an arbitrary and capricious manner in taxing their property and in imposing its permit standards. Finding no issue of material fact, we affirm.

FACTS
In March 1981 Geraldine and Irvin Parkhurst (Parkhurst) purchased a 1.22 acre parcel of land in Silverdale, Washington, for $105,000. In 1982 and 1983, Ventures Northwest Limited Partnership (VNW) purchased 5.36 acres of land contiguous to the Parkhurst property for $467,000. Both parties purchased their properties for investment purposes.
The parcels are located within the 100-year flood plain of Clear Creek, and were undeveloped at the time of purchase. Previously, the land had been zoned residential and used for hay production. In May 1984, Kitsap County rezoned a 15.5 acre parcel that encompassed the subject properties to general business, subject to the owners obtaining approval of a planned unit development plan.
In 1986, Delco Capital Corporation (Delco), as part of an effort to develop a 53-acre site encompassing both parties' properties for a shopping center, entered into purchase and sale agreements with VNW and Parkhurst, contingent upon the issuance of necessary local, state and federal land use approvals for development. Under the terms of the agreements, VNW would receive $1,650,000 and Parkhurst would receive $452,000.
That same year, Delco applied to Kitsap County for a permit to fill and grade 5.51 acres of the property to bring it above the 100-year flood plain. Once completed, the project would cover approximately 89 percent of the site with impervious surfaces.
Delco also sought a Section 404 (Clean Water Act) permit from the Army Corps of Engineers (Corps) to fill wetlands on Parkhurst's property. The application met with "serious opposition from the EPA and others," leading Delco to believe that the Corps would not issue the permit. Accordingly, Delco cancelled its purchase and sale agreements with Parkhurst and VNW and abandoned the permit application before the Corps rendered a final decision. Apparently Delco abandoned its application with the County as well.
Parkhurst and VNW then decided to develop the property themselves, retaining the services of Gary S. Kucinski to file applications on their behalf. On August 11, 1988, Kucinski filed the wetland fill applications with the Corps.
On October 18, 1988, the Corps published and circulated the applications to various federal, state and local agencies and other interested parties. It also wrote Kucinski, asking him to supplement the applications with (1) a "[s]pecific description of the project purpose and need, including the type of commercial activity anticipated and a site development plan" and (2) an analysis of practicable alternatives.[1]
*1184 The Corps explained that without this information, the federal agencies reviewing the application would be unable to determine whether the project complied with the Section 404(b)(1) Clean Water Act provision requiring a fill proposal to be "the least environmentally damaging alternative." The Corps further explained that it would review the Section 404(b)(1) factors at the end of the 30-day public interest review period, which began October 18, and at that time the Corps might ask Kucinski to consider possible mitigation measures in order to minimize perceived environmental impacts.
On October 20, 1988, Kucinski responded to the Corps letter, stating that the development would have "retail, personal, professional and recreational uses." Kucinski resubmitted the same practicable alternatives analysis he submitted with the original applications. Meanwhile, the State Department of Ecology (DOE), at the Corps' request,[2] issued a "Notice of Application for Water Quality Certification and for Certification of Consistency with the Washington Coastal Zone Management Program."
After the public comment period, the Corps sent Kucinski comments from the Environmental Protection Agency (EPA), U.S. Fish and Wildlife Service, National Marine Fisheries Service, Friends of the Earth, Kitsap Audubon Society, and the Suquamish Tribe. All opposed the project and the three federal agencies all recommended denial of the permits. The agencies concluded that the proposed project would adversely impact the environment, that Parkhurst's and VNW's materials were inadequate to perform a Section 404(b)(1) analysis, and that Parkhurst and VNW had failed to overcome the Section 404(b)(1) presumption that less environmentally damaging alternatives were available.
The Corps' letter encouraged Parkhurst and VNW to meet with the agencies to resolve their differences. On December 5, 1988, Kucinski wrote to the Corps expressing concern over the federal agencies' negative comments. He also questioned the efficacy of the suggested meetings given agencies' predisposition to deny the permits.
On December 15, 1988, DOE submitted its comments to the Corps.[3] It found that the application failed to rebut the Section 404(b)(1) presumption or address proposed mitigation measures to offset wetland losses, and that the description of land uses were "vague and ambiguous." DOE concluded that it would be "unable to issue Section 401 Water Quality Certifications" on the project and could not recommend issuance of a Section 404 permit. It also found that the project conflicted with the goals of the Washington Coastal Zone Management Program because of its significant adverse impacts on wildlife habitat and water quality functions.
*1185 See Chapter 173-201A WAC Water Quality Standards.
On February 9, 1989, the Corps wrote to Kucinski, urging him to work with agencies to resolve differences. It again sought additional information to complete the Section 404(b)(1) evaluation. Once again, Kucinski, on behalf of his clients, refused to provide further information, stating that he had provided the Corps with the requested information on October 20, 1988.
In June 1989, the Corps denied the permit applications, identifying three reasons for the denial: (1) non-compliance with Section 404(b)(1) guidelines; (2) the refusal of the State to authorize the project; and (3) the opposition of the U.S. Department of the Interior, the EPA, and the National Marine Fisheries Service.
In April 1989, while the Corps' decision on the Section 404 permits was pending, Parkhurst and VNW applied for a County permit to fill 20,000 cubic yards, and excavate 1,150 cubic yards to "facilitate the future development of the site." On April 10, 1989, the County denied the permit application.
After the denial of these permits, Atlantic Richfield Company (ARCO) offered to purchase slightly less than one acre of VNW's parcel as the site for a proposed AM/PM store. The offer was contingent upon obtaining permission to fill the site. ARCO then contacted the Corps, apparently presenting an alternatives analysis. Based on this meeting, ARCO withdrew its offer, concluding the Corps would not issue the necessary wetlands permit.
In 1990, the County commenced foreclosure proceedings against VNW for failure to pay County Road Improvement District and Utility Local Improvement District assessments and back taxes on its parcel. To protect its investment, VNW filed for Chapter 11 bankruptcy. At that time, VNW owed the County approximately $165,000 in back taxes and assessments.
On December 1, 1991, Parkhurst filed a complaint in Mason County Superior Court alleging that the County and State regulations, on their face and as applied, had denied them all economically viable use of the property and constituted a "taking" without just compensation; that the State and County had unlawfully taxed the property at a commercial value but prohibited commercial development; that Parkhurst had exhausted all administrative remedies available to resolve the dispute; and that the County and State had denied their civil rights in violation of 42 U.S.C. § 1983.[4]
VNW filed a similar complaint, which the court consolidated with the Parkhurst action.[5] Upon motions from the State and County, the trial court dismissed Parkhurst and VNW's claims on summary judgment.

STANDARD OF REVIEW
When reviewing an appeal from summary judgment, the appellate court engages in the same inquiry as the trial court. Marincovich v. Tarabochia, 114 Wash.2d 271, 274, 787 P.2d 562 (1990). Accordingly, the reviewing court must determine whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. Washington Ass'n of Child Care Agencies v. Thompson, 34 *1186 Wash.App. 225, 230, 660 P.2d 1124, review denied, 99 Wash.2d 1020 (1983). All reasonable inferences must be made in favor of the nonmoving party. Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982). The court must resolve any doubts as to the existence of a genuine issue of material fact against the moving party. Atherton Condominium Apartment-Owners Ass'n Board of Directors v. Blume Dev. Co., 115 Wash.2d 506, 516, 799 P.2d 250 (1990). If the moving party satisfies its burden, the nonmoving party must present evidence of material facts in dispute. Atherton, 115 Wash.2d at 516, 799 P.2d 250. Summary judgment is appropriate only if reasonable persons could reach but one conclusion. Safeco Ins. Co. of Am. v. Butler, 118 Wash.2d 383, 394-95, 823 P.2d 499 (1992).

THE FEDERAL WATER POLLUTION CONTROL ACT
The Federal Water Pollution Control Act, otherwise known as the Clean Water Act, 86 Stat. 816, as amended, 33 U.S.C. § 1251 et seq., is a comprehensive water quality statute designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Clean Water Act empowers States to promulgate water quality standards, provided such regulations meet the minimum standards established within the Act. 33 U.S.C. § 1370. States are also responsible for enforcing water quality standards on intrastate waters. 33 U.S.C. § 1319(a).
Section 401 of the Clean Water Act requires states to provide a water quality certification before a federal license or permit may be issued for activities that may result in a discharge into intrastate navigable waters. 33 U.S.C. § 1341; PUD No. 1 v. Washington Dept. of Ecology, ___ U.S. ___, ___, 114 S.Ct. 1900, 1907, 128 L.Ed.2d 716 (1994). Specifically, this section provides that
[a]ny applicant for a Federal license or permit to conduct any activity ... which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, ... that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title.
33 U.S.C. § 1341(a)(1). In the event a state fails or refuses to act upon a request for certification within one year of the request, the certification requirements will be waived. 33 U.S.C. § 1341(a)(1).
The Washington Legislature has authorized DOE to fully participate in the Clean Water Act's programs and to take all actions necessary to satisfy the Act's requirements. RCW 90.48.260. The procedures for acquiring a Section 401 certification from DOE are set forth at WAC 173-225-010 to XXX-XXX-XXX.
Section 404 of the Clean Water Act, 33 U.S.C. § 1344, requires a Corps permit to discharge fill materials into navigable waters of the United States. Navigable waters include wetlands. 33 C.F.R. § 323.2. See United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 124, 106 S.Ct. 455, 457-58, 88 L.Ed.2d 419 (1985). The Corps is empowered to deny permits upon its determination that the discharge "will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." 33 U.S.C. § 1344(c).
As part of the review process, the Corps must publish and distribute the application to various federal, state and local agencies for comment. The Corps must also ascertain from the state whether the project satisfies state and federal water quality standards. If the state refuses to certify the project, the Corps must deny the Section 404 permit. 33 U.S.C. § 1341(a)(1).

UNCONSTITUTIONAL TAKING
A property owner alleging an unconstitutional taking bears the burden of establishing that the challenged regulation destroys any fundamental attribute of ownership, including the right to possess, to exclude others, or to make economically viable use of property. Guimont v. Clarke, 121 Wash.2d 586, 605, 854 P.2d 1 (1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1216, 127 *1187 L.Ed.2d 563 (1994). An owner claiming loss of the economically viable use of property must show that the challenged government regulation proximately caused the loss of all such use. Guimont, 121 Wash.2d at 604, 854 P.2d 1; Orion Corp. v. State, 109 Wash.2d 621, 660, 747 P.2d 1062 (1987), cert. denied, 486 U.S. 1022, 108 S.Ct. 1996, 100 L.Ed.2d 227 (1988); see Gaines v. Pierce County, 66 Wash.App. 715, 726, 834 P.2d 631 (1992), review denied sub nom. State v. Lakeside Indus., 120 Wash.2d 1021, 844 P.2d 1017 (1993); Lambier v. City of Kennewick, 56 Wash.App. 275, 283 n. 4, 783 P.2d 596 (1989), review denied, 114 Wash.2d 1016, 791 P.2d 535 (1990). Further, a challenge involving application of a regulation to a specific piece of property is not ripe for adjudication until the property owner exhausts all administrative remedies. Presbytery of Seattle v. King County, 114 Wash.2d 320, 333, 787 P.2d 907, cert. denied, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990).

42 U.S.C. § 1983
A cognizable claim for relief under 42 U.S.C. § 1983 must allege that (1) defendant acted under color of state law; and (2) defendant's conduct deprived the plaintiff of rights, privileges or immunities protected by the United States Constitution. Brower v. Wells, 103 Wash.2d 96, 104-05, 690 P.2d 1144 (1984); Grader v. City of Lynnwood, 53 Wash.App. 431, 767 P.2d 952, review denied, 113 Wash.2d 1001, 777 P.2d 1050, cert. denied, 493 U.S. 894, 110 S.Ct. 243, 107 L.Ed.2d 193 (1989).

I

CLAIMS AGAINST THE STATE

A. Takings Claim

1. Loss of Economic Viability

Parkhurst and VNW claim that they presented evidence showing that the State denied them the economically viable use of their property. They contend that the State's denial of the Section 401 certification was the proximate cause of the Corps' denial of the Section 404 permit. They further contend that because the Corps denied their permit application, their property has no economic viability. The record, however, does not support either contention.
"Proximate cause means a cause which, in a direct sequence unbroken by any new independent cause, produces the injury complained of, and without which such injury would not have happened." Fisher v. Parkview Properties, Inc., 71 Wash.App. 468, 476, 859 P.2d 77 (1993); WPI 15.01. Proximate cause has two elements: cause in fact and legal causation. Hartley v. State, 103 Wash.2d 768, 777, 698 P.2d 77 (1985).
Cause in fact refers to "but for" consequences of an act. Hartley, 103 Wash.2d at 778, 698 P.2d 77. A court cannot resolve such questions of fact on summary judgment "unless but one reasonable conclusion is possible." Hartley, 103 Wash.2d at 778, 698 P.2d 77. In a summary judgment proceeding for inverse condemnation, the plaintiff must present evidence that supports at least a reasonable inference that the damage alleged to constitute a taking would not have occurred but for the governmental conduct in issue. Gaines, 66 Wash.App. at 726, 834 P.2d 631.
Legal causation rests on policy considerations as to how far a party's responsibility for the consequences of its actions should extend. Taggart v. State, 118 Wash.2d 195, 226, 822 P.2d 243 (1992). "[D]etermination of legal liability will be dependent on `mixed considerations of logic, common sense, justice, policy, and precedent.'" Hartley, 103 Wash.2d at 779, 698 P.2d 77 (quoting King v. City of Seattle, 84 Wash.2d 239, 250, 525 P.2d 228 (1974)); Pleas v. City of Seattle, 49 Wash.App. 825, 746 P.2d 823 (1987), rev'd on other grounds, 112 Wash.2d 794, 774 P.2d 1158 (1989).
Parkhurst and VNW have failed to present evidence showing that the State's action was the cause in fact of the Corps decision to deny the Section 404 permit application. The State presented unrebutted evidence that the Corps' denial of the permit was based upon (1) the absence of a Section 404(b)(1) alternatives analysis and of mitigation measures, and (2) opposition to the project *1188 by the federal agencies participating in the permit review process.
The State's evidence included the Corps' warning that it needed additional information to approve the application. Despite this warning, Parkhurst and VNW refused to provide an adequate description of proposed uses and simply resubmitted their original alternatives analysis.
After determining that the project would adversely impact the Clear View Creek ecosystem, in November 1988 all three federal agencies reviewing the application recommended denial. They also determined that Parkhurst and VNW had failed to provide adequate materials to rebut Section 404(b)(1)'s presumption that less damaging alternative sites for the project existed.
Also in November, two environmental organizations and the Suquamish Indian Tribe expressed their opposition to the permit, in part because the application did not adequately address the Section 404(b)(1) alternatives analysis.
Finally, in December, DOE also found the application insufficient to overcome the Section 404(b)(1) presumption that the project would have a significant adverse impact on the environment and was not in the public interest.
Clearly, the Corps had a basis to deny the permit even before it received the State's December 15, 1988 letter. The evidence indicates that the State's response was not the proximate cause for the Section 401 permit denial.
Nor does the record establish that the property currently lacks any economic viability. Parkhurst and VNW purchased the property for investment purposes. The mere denial of a permit for one particular use does not establish the absence of any economically viable use; a regulation that may impact the property's highest and best use is not a taking. Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 384, 47 S.Ct. 114, 117, 71 L.Ed. 303 (1926).
Parkhurst and VNW argue for a modified proximate cause test. Relying on Askew v. Gables-By-The-Sea, Inc., 333 So.2d 56 (Fla.App.1976), cert. denied, 345 So.2d 420 (1977), they argue it is sufficient to show that the State's refusal to issue the Section 401 permit "contributed to" causing their property to be undevelopable.[6]
This argument fails. First, the Askew case does not discuss standards of causation and does not hold that contributing is sufficient. Second, it does not appear that the Askew court would have adopted the "contributed to" test even if it had dealt with this issue. Third, a "contributing to" proximate cause test is inconsistent with the two-prong proximate cause test relied upon by Washington courts in regulatory takings cases.
Although we reject the State's contention that its December 15, 1988 letter did not constitute a denial of the certification application, this point is not necessary to our conclusion. An agency letter that clearly fixes a legal relationship as a consummation of the administrative process is a final order. Valley View Indus. Park v. City of Redmond, 107 Wash.2d 621, 634, 733 P.2d 182 (1987). We resolve all doubts as to whether the letter is clearly understandable as a final determination of rights in favor of the citizen. Valley View, 107 Wash.2d at 634, 733 P.2d 182. Here, the December 15 letter, viewed in the light most favorable to the nonmoving party, raises a question of material fact as to whether DOE denied Section 401 certification.
Nor is our decision based on the fact that the State submitted its response after the other agencies had submitted their negative responses. Such a test would encourage agencies to delay their responses and would not provide an adequate basis to evaluate *1189 takings claims. Instead, we base our decision on the evidence that Parkhurst and VNW, by failing to provide the requested alternative analysis information, caused the State and the Corps to deny approval.
2. Exhaustion of Administrative Remedies
The State also argues that the Parkhurst and VNW claims are not ripe because of (1) failure to exhaust administrative remedies and (2) failure to demonstrate that resort to such remedies would be futile.
Whether a takings case is ripe for adjudication is a question of law. Estate of Friedman v. Pierce County, 112 Wash.2d 68, 75-76, 768 P.2d 462 (1989). In Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 186, 105 S.Ct. 3108, 3116, 87 L.Ed.2d 126 (1985), the Court held that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue."
A final decision is necessary because a takings claim necessarily requires the court to compare the present value of the regulated property against the value of the property before imposition of the regulation. In doing so, the court ascertains whether the regulation has diminished the economic uses of the land to such an extent that an unconstitutional taking has occurred. Thus, "a final governmental decision as to permitted uses of the land is generally a condition precedent to resolution of an inverse condemnation claim." Friedman, 112 Wash.2d at 78-80, 768 P.2d 462.
Here there was only one final decision on an application to develop the subject property, as both Delco and ARCO withdrew their applications before there was a final administrative ruling. The Corps' rejection of one project is insufficient to establish that it would reject all projects; there may be other projects or mitigation measures that would allow use of the property. Parkhurst and VNW have not shown that the challenged regulation denied them all economic benefit of their land. Guimont, 121 Wash.2d at 597-98, 854 P.2d 1; see also Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1019 n. 8, 112 S.Ct. 2886, 2895 n. 8, 120 L.Ed.2d 798 (1992) (discussion of phrase "deprivation of all economically beneficial use").
Nor have Parkhurst and VNW shown that other attempts to use their land would be futile.
Once a defendant in a regulatory takings case raises as a defense the landowner's failure to exhaust administrative remedies, a landowner seeking to establish futility as an exception to the exhaustion requirement must persuade the court that futility excuses exhaustion. The landowner's burden is necessarily a substantial one for two reasons: first, the policies favoring the doctrine of exhausting administrative remedies, and, second, the necessity in the usual regulatory takings case of showing deprivation of all or substantially all economic use of the land.
Friedman, 112 Wash.2d at 77-78, 768 P.2d 462. We find no evidence in the record, other than bare assertions by the parties or their representatives that it would have been futile for them to pursue other uses of the land. The case is not ripe for adjudication and dismissal by summary judgment was appropriate.

B. 42 U.S.C. § 1983
As the Parkhurst and VNW takings claim fails, there is no basis for the 42 U.S.C. § 1983 claim.

C. Tax Assessments
Parkhurst and VNW ask this court to invoke its equitable powers and order the reassessment of their property at its fair market value, i.e., $21,000 for the VNW parcel and $4,000 for the Parkhurst property. The record on appeal does not contain documentation of the actual current assessment. It does contain a proposed decision of the State Board of Tax Appeals. That decision indicates that the Parkhurst property is currently assessed at $108,900 and the VNW parcels at $275,400 and $186,300, and that *1190 the assessment is based on the current listing price of the property, prior sales, and commercial development potential.
The appropriate avenue of relief to challenge assessed valuation is an appeal from the final decision of the Board of Tax Appeals. RCW 82.03.180. We know of no authority that would allow this court to grant the equitable relief requested. See British Columbia Breweries (1918), Ltd. v. King County, 17 Wash.2d 437, 450-51, 135 P.2d 870 (1943) (equity will interfere only upon showing of fraud, capriciousness, or malice in decision setting property valuation).

II

CLAIMS AGAINST KITSAP COUNTY

A. Takings
Nor did Kitsap County engage in an unconstitutional taking when it denied Parkhurst's and VNW's application for a fill and grade permit. The applicants planned to use the site for a 58,225 square foot commercial building area, to include a drug store, retail shops, a restaurant, an auto store, and a bank.
The County denied the permit application for three reasons:
The proposal is inconsistent with Clear Creek Master Plan Policies for this area, and in any case, cannot be approved prior to Planned Unit Development approval of specific site development plan. The majority of the site is wetlands and will require a 404 permit from the U.S. Army Corps of Engineers.
Parkhurst and VNW complain that the County reached these conclusions based upon unwritten internal administrative policies that were not clearly defined and, thus, are void for vagueness. See Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (prohibitions that are not clearly defined are void for vagueness as a principle of due process because they allow for arbitrary and discriminatory enforcement). However, when the County conditionally rezoned the property in 1984, it conditioned the rezone on approval of a planned unit development. As the applicants did not show satisfaction of the condition, the County's denial of the permit was reasonable.
Nor are we persuaded by the Parkhurst and VNW argument that they are entitled to relief because County wetland regulations contributed to their inability to develop their property. They have failed to show (1) their property has no economically viable uses or (2) that the County's failure to grant the fill and grade permit resulted in this loss of economic viability.

B. 42 U.S.C. § 1983
As the takings claim fails, there is no basis for the 42 U.S.C. § 1983 claim.

C. Tax Assessment Claim
The tax assessment claim also fails for the same reasons discussed above with regard to the State.

CONCLUSION
The burden upon a claimant asserting that the government has taken his or her property is a heavy one. It requires proof that the enforcement of a regulation proximately caused the loss of all economic viability of the claimant's property and a showing that the claimant has exhausted all available remedies or that resort to such remedies would be futile. Parkhurst and VNW here have failed to make a prima facie showing of causation, loss of economic viability, exhaustion, and futility. Thus, the trial court properly dismissed their taking claims upon a motion for summary judgment.
Judgment affirmed.
MORGAN and BRIDGEWATER, JJ., concur.
NOTES
[1] 40 C.F.R. § 230.10 directs the Corps to conduct an analysis of practicable alternatives in the following manner:

(1) For the purposes of this requirement, practicable alternatives include, but are not limited to:
(i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters;
(ii) Discharges of dredged or fill materials at other locations in waters of the United States and ocean waters;
(2) An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.
(3) Where the activity associated with a discharge which is proposed for a special aquatic site ... does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e. not "water dependent."), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.
[2] Apparently, DOE's certification process was initiated in response to the Corps' request. Appellants acknowledge that they had no contact with DOE while the Section 404 permits were pending.
[3] DOE's comment letter states, in relevant part:

In summary, this project appears to be a non water dependent activity with upland alternatives and significant adverse impacts to wetlands and water resources. It does not appear to be in the public interest to degrade wetland habitat and water quality for a speculative development, with no mitigation proposed to compensate for lost wetland values and functions. Furthermore, the cumulative impacts to the Clear Creek drainage and associated wetlands have already significantly degraded the habitat available to runs of coho and chum salmon and cutthroat trout.
On behalf of the State of Washington, we are unable to issue Section 401 Water Quality Certifications for these projects. Also, on behalf of the State of Washington, we cannot recommend issuing Section 404 permits for these projects.
[4] VNW apparently filed an identical complaint against the State and County, although this pleading has not been included in the Clerk's Papers.
[5] Parkhurst and VNW also indicate that they are pursuing or planning to pursue a takings claim against the Corps in the United States Court of Claims, where a claim in excess of $10,000 for a regulatory taking under the Fifth Amendment must be filed. Orion Corp. v. State, 109 Wash.2d 621, 635, 747 P.2d 1062 (1987), cert. denied, 486 U.S. 1022, 108 S.Ct. 1996, 100 L.Ed.2d 227 (1988); 28 U.S.C. §§ 1346(a)(2), 1491; Reid v. United States, 715 F.2d 1148, 1153 (7th Cir.1983). The Court of Claims jurisdiction is narrowly restricted to the adjudication of suits brought against the United States alone. United States v. Sherwood, 312 U.S. 584, 589, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941). Accordingly, Parkhurst and VNW cannot join their actions against the Corps, the State, and the County in one forum. Under such circumstances, the Washington Supreme Court has ruled that a party may pursue its takings claim against the state and county in state court. See Orion, 109 Wash.2d at 635-36, 747 P.2d 1062 (exclusive jurisdiction of Court of Claims over takings actions against United States does not preclude state court from reviewing takings claim against state and county).
[6] In Askew, Gables-By-The-Sea had obtained a dredge and fill permit from the Army Corps of Engineers in order to fill submerged land it had purchased from the State, land which was otherwise unusable. The permit allowed Gables to dredge public lands in Biscayne Bay. By subsequent state action, dredging became illegal in this area and state acts challenging Gables' ability to dredge caused Gables' Corps' permit to expire. Subsequent applications were denied. The court granted a mandatory injunction requiring the State to condemn Gables' property and provide just compensation.