664 So.2d 930 (1995)
DEPARTMENT OF COMMUNITY AFFAIRS, Petitioner,
v.
Charles MOORMAN, et al., Respondents.
No. 82946.
Supreme Court of Florida.
September 28, 1995.
Rehearing Denied December 20, 1995.
*931 David J. Russ and Brigette A. Ffolkes, Assistant General Counsels, Department of Community Affairs, Tallahassee, for petitioner.
Theodore W. Herzog, Key West, for respondents.
Richard Grosso, Tallahassee, amicus curiae for 1000 Friends of Florida.
KOGAN, Justice.
We have for review Moorman v. Department of Community Affairs, 626 So.2d 1108 (Fla. 3d DCA 1993), because of express and direct conflict with Harrell's Candy Kitchen Inc. v. Sarasota-Manatee Airport Authority, 111 So.2d 439 (Fla. 1959), among other decisions. We have jurisdiction. Art. V, § 3(b)(3), Fla. Const.
This case involves the validity of a land-use ordinance enacted to protect an endangered species, the miniature Florida Key deer. The regulation affects Big Pine Key where the deer now are largely concentrated. Human development on the Key has put the deer perilously close to extinction, and their numbers are estimated to be only 350 to 400 animals. The minimum number needed to sustain a viable species is considered 100 to 250 animals. The animals are further endangered by human attempts to feed them, by pet dogs that may kill them, and by automobiles.
*932 The ordinance in question prohibits the erection of fencing in portions of Big Pine Key, where the respondents own property. It was enacted because, in a natural environment, Key deer must roam freely over slash pinelands and wetlands in search of food and water. This necessarily means the deer also must roam over some privately owned lands. The blanket prohibition on fencing was meant as an interim restriction to be replaced within a year by a more comprehensive regulation that would better identify where fence restrictions would be proper and where they were unnecessary. Despite its interim nature, the ordinance had been on the books for more than five years before the times in question here.
Charles Moorman owns a lot located in the slash pinelands of Big Pine Key. He also is owner of Your Local Fence, a company that is a respondent in this review. Moorman filed for a permit to build a six-foot-high 400-foot-long fence, which Monroe County granted. This was done notwithstanding the "interim" county ordinance. The record contains evidence that Moorman's fence is in a location that will adversely affect the Key deer.
The Department of Community Affairs ("DOCA") appealed the County's decision pursuant to DOCA's authority over areas of critical state concern. § 380.07(2), Fla. Stat. (1993). The Moorman lot sits in an area designated as a "critical state concern" in 1979.[1] § 380.0552, Fla. Stat. (1993).
The case was referred to a Division of Administrative Hearings ("DOAH") officer, who found the permits improper. The finding specifically noted that the permits were issued as a matter of right. The officer recommended that the Cabinet, sitting as the Florida Land & Water Adjudicatory Commission ("Commission"), rescind the permits, and the Cabinet agreed. The Moormans then appealed to the Third District, which ruled the anti-fencing regulation facially unconstitutional.
The nub of the issue here is a simple failure to revisit an "interim" land-use regulation that was never intended to be a permanent feature of the county code book, as it seemed to have become by the times in question. While Monroe County chose not to apply the ordinance to respondents, DOCA now has taken the position that the ordinance must be enforced according to its strict letter. DOCA likewise contends that sufficient justification exists for such a blanket prohibition on fencing in the affected area.
We do not dispute that the State has a legitimate interest in protecting the natural habitat of the Keys and most especially of the Key deer. To this end, the State does in fact have a right to use its police power to establish land-use regulations addressing environmental concerns. Graham v. Estuary Properties, 399 So.2d 1374, 1381 (Fla.), cert. denied, 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1981). The clear policy underlying Florida environmental regulation is that our society is to be the steward of the natural world, not its unreasoning overlord. As the Constitution itself states:
It shall be the policy of the state to conserve and protect its natural resources and scenic beauty. Adequate provision shall be made by law for abatement of air and water pollution and of excessive and unnecessary noise.
Art. II, § 7, Fla. Const. There is an obvious public interest in such a policy, given the fact that environmental degradation threatens not merely aesthetic concerns vital to the State's economy but also the health, welfare, and safety of substantial numbers of Floridians. Sarasota v. Barg, 302 So.2d 737 (Fla. 1974).
The right of equal protection embodied in article I, section 2 stands for many things, but it does not restrict the State's ability to establish or mandate reasonable environmental regulations, even those that may apply only in a certain area, where the State is addressing an environmental problem peculiar to the area. Even if equal protection is implicated here, the State would only need a rational basis for the zoning restriction. Here, the State has identified a sufficient interest in this instance to justify the classification in question. The interest is *933 plainly stated in article II, section 7 of the Constitution and is only underscored by the unique problem of the Key deer.
The right of privacy set forth in article I, section 23 also does not apply here for a self-evident reason: The decision to use land in a manner contrary to lawful public environmental policy is simply not a private act. Art. I, § 23, Fla. Const. Landowners do not have an untrammeled right to use their property regardless of the legitimate environmental interests of the State.
The right of due process contained in article I, section 9 poses a somewhat different problem, because it does in fact guarantee the right to enjoy property. Within limits, that right can include decisions regarding the improvement of property. Nevertheless, this personal right does not necessarily supervene the rational concerns of public environmental policy. Due process, in other words, seeks to find a balance between public and private interests, not to make the landowner lord over the State, nor the State lord over the landowner.
The State is given wide range in exercising its lawful powers to regulate land use for environmental reasons, and any such land-use regulations thus are valid if supported by a rational basis consistent with overall policies of the State. See Board of County Comm'rs v. Snyder, 627 So.2d 469 (Fla. 1993). Landowners simultaneously are protected by yet another feature of the law: Any resulting erosion of property value beyond reasonable limits is recompensable by means of inverse condemnation. Art. X, § 6, Fla. Const.; art. I, § 9, Fla. Const. In sum, the rights of property owners are limited by the lawful environmental policies of the State, and the State acting within its lawful power to regulate property is likewise limited by the depth of its purse. Id.
However, we have repeatedly held that zoning restrictions must be upheld unless they bear no substantial relationship to legitimate societal policies. E.g., Harrell's Candy Kitchen v. Sarasota-Manatee Airport Authority, 111 So.2d 439 (Fla. 1959). Here, the record contains competent substantial evidence that the unregulated erection of fencing in the affected area is contrary to Florida's overall policy of environmental stewardship. In this sense, we agree with the argument of DOCA and disagree with the district court below. Because the ordinance promotes a valid public policy, it should not have been stricken on its face.[2]
Nevertheless, we are constrained to determine whether any valid basis existed for denying the Moormans a permit. We of course recognize that the enactment in question today was intended merely as an "interim" rule. This fact in turn means the blanket prohibition against fencing was never regarded as an essential feature of public policy. Rather, the underlying intent was to replace the ordinance with something less restrictive, although this intent regrettably was never carried forward into action.
In this vein, DOCA's own expert witness testified in the following terms at the DOAH hearing below:
Q. All right. Now, sir, the statements that you've made today, and just now, and also one more, you gave indication that there were good fences and bad fences, that's within the standard you're now planning, is that true?
A. Yes.
Q. Because I want to characterize that accurately. But again, now, the opinions that you are expressing now are not necessarily the basis of the ordinance which is in place, isn't that true? Since it precludes fences?
A. Yes, you're right. I had nothing to do with that ordinance. So, I can't comment on it.
Q. Certainly, and that's the only point I'm trying to make here. But it is accurate to say that the ordinance excluding fences, or precluding them, extends beyond what your specific recommendations *934 are based on your expertise as you've explained today?
A. That's correct.
However, the uncontroverted expert evidence clearly indicated that the Moormans' fence  the only one at issue here today  was harmful to Key deer habitat.
Based on the foregoing, we find that the application of the ordinance to this particular fence permit was constitutional because it was based on a rational basis consistent with state environmental policy. For this reason, the decision below is quashed and this cause is remanded for proceedings consistent with our views here.
It is so ordered.
OVERTON, SHAW, HARDING and ANSTEAD, JJ., concur.
GRIMES, C.J., concurs in part and dissents in part with an opinion, in which WELLS, J., concurs.
GRIMES, Chief Justice, concurring in part and dissenting in part.
I agree that the ordinance is constitutional on its face. I cannot agree that it was necessarily constitutional as applied. At the hearing, Charles Moorman testified that the purpose for his fence was to keep his neighbor's two children from falling into his hot tub and to keep the Key Deer from eating his plants. He also testified that his fence was only about 400 feet long.
Despite the fact that this interim ordinance had been on the books for more than five years, this case was tried on an all-or-nothing basis upon the assumption that the Moormans' permit must either stand or fall without adjustment. By virtue of its authority to attach conditions and restrictions to its decision, the Cabinet had the power to fashion a remedy that would soften the blanket prohibition against fencing while at the same time honor environmental stewardship.
I would remand the case for another hearing directed toward whether the regulation was unconstitutional as applied to the Moormans or, alternatively, whether the permit should be modified.
WELLS, J., concurs.
NOTES
[1] The fact the land in question sits in an area of critical state concern is crucial to the result in this case, because it identifies an environmental concern unique to Big Pine Key.
[2] We do note that the Cabinet sitting as the Florida Land & Water Adjudicatory Commission may rescind land-use permits in the Florida Keys or "may attach conditions and restrictions to its decisions." § 380.07, Fla. Stat. (1993). The record is unclear why the Cabinet did not exercise this last grant of authority here.