MAKAR, J.,
concurring in part, dissenting in part.
Karen and Reppard Bennett appeal the trial court’s ruling in favor of Walton County on their substantive due process claim, finding the land development code’s prohibition on “nonresidential uses” was facially invalid, a ruling that should be affirmed. The trial court, however, held the Bennetts’ as-applied substantive due process claim did not extend to the County’s executive actions, entering judgment for the County without addressing the merits of the claim. I agree that the Bennetts’ have stated a viable as-applied substantive due process claim under state law, but rather than adjudicate it on appeal, I would reverse for further proceedings to allow the trial court to do so in the first instance.
I.-
Walton County is topographically unique. It has Florida’s highest elevation in its hilly northern region abutting Alabama, and is home on its southern shoreline to some of the world’s most beautiful beaches. Along this “Emerald Coast” on the Gulf of Mexico lie popular destinations such as Destín, Grayton Beach, and Rosemary Beach, among others, that have risen from sleepy coastal settlements into desirable and bustling vacation locales. Tensions naturally have arisen as the tranquil residential character of coastal life has morphed into a more robust vacation mindset with short-term home rentals becoming commonplace.
Due to increased beach tourism, the Bennetts — like many other like-minded Panhandle entrepreneurs — developed a business model of purchasing residential properties to be used solely as vacation rental units. Their company, Pearly White Properties, LLC, oversees six houses leased as vacation properties and marketed under kitschy names: Anger Management, Backsplash, Beach Baby, Sunny Day in Paradise, Sunsational, and Triple Crown. This case involves only the Triple Crown, a three-story triplex located on a narrow (63' x 202') strip of land on the southside of East County Highway 30A, the main roadway that parallels the Gulf. The Bennetts purchased the property in 2002 and deeded it to the Karen B. Bennett Revocable Trust. For the next six years, the Triple Crown was marketed generally as a rental retreat very near, but not directly on, the beachfront.
But that changed in 2008 when the Ben-netts purchased the undeveloped beachfront lot located between the Triple Crown and the Gulf, which was groomed into an open greenspace dubbed “The Lawn” as an amenity to the Triple Crown, making it highly desirable for beachfront events. Together, the two lots form a long, narrow, littoral corridor (about 63' x 575') from the roadway to the mean high water line with neighboring residences close-by along much of its length.
The Bennetts combined the deeds for the two parcels to better facilitate the joint marketing of the duo as an event venue, riding the wave of beach wedding tourism, a blossoming industry in Walton County at the time. The Triple Crown, with its 10 bedrooms that sleep 30 people,[1] was naturally suited for larger groups who sought out the accommodations for wedding *392 events, family reunions, anniversary celebrations, corporate groups, and even a funeral. And the manicured expanse of The Lawn only increased the demand for nuptials at the site. As a result, the occasional wedding the Triple Crown alone had previously attracted ballooned into approximately 22 weddings in 2009, 13 in 2010 (the year of the BP oil spill), 23 in 2011, and 18 in 2012, clustered predominately in the temperate months of April, May, and October.
.The Triple Crown and The Lawn are squarely within the Dana Beach subdivision, a platted community of properties collectively designated as “Residential Preservation Area” in the County’s Land Development Code. Only residential uses are permissible: “nonresidential uses are not allowed” within the Residential Preservation Area as specified in code section 2.01.03(L)(3)(a)(iii), which we will refer to as the “Code” to simplify things.[2] The problem is that the community has shifted away from its original strictly “residential” orientation. Though the precise extent of rental properties in the subdivision and its vicinity is unclear on the current record, many — if not most — of the residential properties in the area are leased on a short-term basis. Much like the Triple Crown, many of the properties in the im-. mediate area are designed specifically for the beach rental market. No one in this litigation — including the County — suggests that such rentals are impermissible “nonresidential” or “commercial” uses. As a consequence, those who reside full-time in the community are literally surrounded, if not engulfed, by the rental marketplace that has transformed the area.
Complaints from two neighbors precipitated the code enforcement actions at the root of this dispute. One neighbor was particularly unhappy with the cycle of weddings and their attendant soirées. Mr. Joe Stanko, who lives with his wife in a condominium unit adjacent to The Lawn, became dispirited as the number and boisterousness of weddings increased. He complained to local officials, who in turn undertook investigative efforts. As he later opined at a 2010 code enforcement proceeding, the venue had become a “em-eus” due to weddings that at times got out of hand (it was actually the receptions that caused the most concern, but for simplicity, references to “weddings” will include pre- and post-nuptial on-site receptions). He recounted the “nightmare” of wedding weekends that began on Thursdays with casual gatherings on The Lawn, were followed by Friday evening rehearsal dinners with bands/disc jockeys/dance floor, and concluded with the wedding and Saturday receptions that sometimes went beyond the 10pm curfew (“The party continues as long as the booze is flowing.”). Music was so loud at times that his grandchildren’s photographs on his dresser “started moving around.” Revelers pulled the breakers on his air conditioning unit, whose compressor’s noise detracted from wedding toasts; urinated under his building (“at least the guys do”), and gave him “one finger salutes” when he undertook self-help measures. He acknowledged that music was usually, but not always, turned down when a request was made and that no citations had ever been issued against the Bennetts. For their part, the Ben-netts felt they had addressed the neighbors’ concerns, going so far as to provide an on-site deputy, who would give his cellphone number to Mr. Stanko (“They’re pretty nice guys.”). The sheriff also gave his direct line to Mr. Stanko to call if festivities were getting out of hand.
Thus began a series of on-again, off-again enforcement activities by the Coun *393 ty, which has limited code enforcement resources. Most of its enforcement actions are complaint driven; compliance officers don’t have time to drive around looking for violations. As a result of Mr. Stanko’s complaint, in February 2010 the County’s code enforcement department told the Bennetts they were in violation of the Code, taking the position that renting their property to visitors and advertising the property as a wedding destination amounted to prohibited “nonresidential uses.” At the hearing on the notice of violation, County officials, including the code enforcement officer and the County Administrator, Gerry Demers, who was the former Planning Director responsible for the interpretation of the Code, testified that events such as weddings are permitted under the Code, but that the manner in which the Bennetts’ marketed their property as wedding-ready via internet sites and the frequency of events resulted in the determination that the Bennetts were conducting a “nonresidential use” of the property. When asked how many events could be held without violating the Code, Mr. Demers offered no official position, saying only that to be found in compliance with the .residential use requirements was to “use the property for a residential use.” The Code Enforcement Board found the Bennetts in violation of the Code, issuing an order on June 3, 2010. The Bennetts appealed the order, alleging violations of' due process and other irregularities with the procedure of the code enforcement hearing. In December 2010, the circuit court upheld the order.
Based on the County’s position that events were permissible as a general matter, the Bennetts resumed renting their property, albeit with some changes to attempt to comply with the County’s concerns. For example, they stopped charging different rates for renters who intended to hold events; instead, they charged a uniform rate, leaving the uses of the property up to the renters. In March 2011, the County again told the Bennetts that they were in violation of the Code. The Bennetts again asked the enforcement officers for guidance on what specifically was, and was not, allowed on the property. Via email, the officers advised the Bennetts that if they removed all references to weddings from their rental website, and paid administrative fees relating to the 2010 code enforcement hearing, they would be deemed in compliance. The Bennetts complied, and the County’s code enforcement officer swore an affidavit, later recorded in the public records, declaring that the Ben-netts were in compliance.
Whatever truce was in place soon dissolved as Mr. Stanko and another neighbor registered more complaints. The issue of how the Code should be interpreted, and whether the Code should be amended to regulate the frequency of events within residential classifications, became a topic of intense local interest. As a result, on April 12, 2011, the County Commission, held a public hearing on a proposed ordinance that would have regulated the frequency of. events, but it failed to pass.
Days later, on April 19,2011, the County ’ noticed the Bennetts for a third time that they were in violation of the Code. The Code Enforcement Board held a hearing at which the County’s enforcement officer testified that a new 'interpretation of the Code would be applied- a single “event” held by a renter of the Triple Crown would result in a code violation. Under this new standard, the Code Enforcement Board found the Bennetts in violation of the Code, levying fines of $500 per each event day.
*394 On October 11, 2011, the Bennetts sued Walton County under various theories. Pertinent here, Count 1 of their Second Amended Complaint, entitled “Violation of Plaintiffs’ Substantive Due Process Rights Under United States and Florida Constitutions,” sought a declaratory judgment and injunctive relief for violations of their substantive due process rights under the Fourteenth Amendment to the U.S. Constitution and Article I, sections 2 and 9 of the Florida Constitution. In this count, they alleged that the Code, which prohibits “nonresidential use” of the property, is unconstitutional, both facially and as-applied to them by the County. Their prayer for relief sought “[ijssuance of a declaratory judgment declaring that Defendant’s actions violate Plaintiffs’ right to substantive due process as guaranteed by the Fourteenth Amendment to the United States Constitution, and by Article I, §§ 2 & 9, of the Florida Constitution.” (Emphasis added).[3]
Walton County moved for summary judgment, arguing that the phrase “nonresidential use” is not unconstitutionally vague because it gives a person of ordinary intelligence fair notice of the conduct that is prohibited. Although it is not defined in its Code, the County’s Comprehensive Plan defines the phrase as “any use that is not residential, such as civic, public, commercial, industrial, etc.” The County also noted that the private covenants for the Dana Beach Subdivision provided that “no business may be conducted on any part” of the property. At the hearing on the motion, the Bennetts focused on the fact that no County official was able to say how many events would constitute a nonresidential use, and that enforcement of the “nonresidential uses” was complaint driven. They also claimed that since 2010, the County has only enforced the Code against them.
In its written order, the trial court granted the County’s motion for summary judgment, ruling that the “term ‘non-residential uses’, as contained in the Code section at issue Section 2.01.03(L)(3)(a)(iii) of the Walton County Land Development Code, is sufficiently clear and unambiguous to survive a facial due process challenge. The term ‘non-residential’ conveys a sufficiently definite warning as to the proscribed conduct when measured by common understanding.” Judgment was also entered on the Bennetts’ as-applied substantive due process claim, which was deemed non-actionable; as a consequence, the trial court did not consider the merits of the as-applied claim. After a joint dismissal without prejudice of other counts (including their equal protection claim), the Bennetts filed this appeal.
II.
The issue presented is whether summary judgment in favor of the County was appropriate on the Bennetts’ constitutional claim, which included both facial and as-applied challenges. As to the former, no error exists in the trial court’s conclusion that the term “nonresidential” generally has a sufficiently well-understood meaning to survive a facial attack. See Nostimo, Inc. v. City of Clearwater, 594 So.2d 779, *395 781 (Fla. 2d DCA 1992) (concluding that “trial court was correct in finding the Clearwater City Code section constitutional on its face”). The existence of obviously impermissible “nonresidential uses” such as waste incinerator plants or adult entertainment clubs renders it susceptible to some lawful applications, defeating the facial constitutional claim.
That the Code is facially valid does not answer the question of whether it was applied in an unconstitutional fashion. Nostimo, 594 So.2d at 781 (“[E]ven though the code section may be constitutional on its face, it may still be unconstitutional as-applied for denying appellant substantive due process.”). Rather than address the merits of the Bennetts’ as-applied claim, the trial court discharged it as non-actionable, citing to federal caselaw that precludes a federal substantive due process challenge to local executive actions such as zoning decisions. Doing so, however, was error for two related reasons.
First, those cases preclude only federal court review of federal claims challenging state executive action, leaving open possible review of state constitutional claims in state courts. The Bennetts’ substantive due process claim includes a state challenge under the due process clause in Florida’s constitution, which differs from challenges on federal Fourteenth Amendment due process grounds. As to the latter, substantive due process under the federal constitution “protects ‘fundamental’ rights or interests that are deeply rooted in this Nation’s history and tradition.” City of Lauderhill v. Rhames, 864 So.2d 432, 438 (Fla. 4th DCA 2003) (reviewing only a section 1983 due process claim under the Fourteenth Amendment). Lacking a fundamental right or such an interest, the Bennetts’ federal substantive due process claim is not actionable on that basis.
But they also assert a substantive due process claim under Florida’s jurisprudence, which allows for such claims under state constitutional principles — even if no fundamental right is involved[4] — applying an equal protection-type test. See, e.g., WCI Cmtys., Inc. v. City of Coral Springs, 885 So.2d 912, 914 (Fla. 4th DCA 2004) (“Substantive due process challenges to zoning regulations are analyzed under the rational basis test.”); Polakoff v. Dep’t of Ins. & Treasurer, 551 So.2d 1223, 1225-26 (Fla. 1st DCA 1989) (“Where no fundamental rights are involved, the test is essentially the same for both equal protection and substantive due process analysis.”); see also Joseph v. Henderson, 834 So.2d 373, 375 (Fla. 2d DCA 2003) (“When no fundamental right is at stake, the standard for evaluating a substantive due process challenge is the same as' the rational basis test used for evaluating equal protection challenges.”); see generally United Yacht Brokers, Inc. v. Gillespie, 377 So.2d 668, 671 (Fla.1979) (substantive due process test is whether the act has “a reasonable relation to a permissible legislative objective” and is “not ... ‘discriminatory, arbitrary or oppressive.’ ”) (citation omitted). What matters is what state courts have said about a state constitutional claim, not what federal courts have said about a similar federal right.
Second, a rationale against federal review of local regulatory decisions, such as *396 zoning matters, under a federal substantive due process theory is the avoidance of federal court intrusion on Fourteenth Amendment grounds into state executive matters better suited for review in state tribunals. See DeKalb Stone, Inc. v. Cnty. of DeKalb, Ga., 106 F.3d 956, 960 (11th Cir.1997) (“Federal courts must not usurp the roles of agencies, review boards, and state courts in reviewing the wisdom of executive actions.”) (emphasis added); Mackenzie v. City of Rockledge, 920 F.2d 1554, 1558 (11th Cir.1991) (“Federal courts do not sit as zoning boards of appeals.”). While federal courts may consider federal substantive due process claims against federal executive actors and agencies,[5] federalism concerns have limited the reach of the federal due process clause to state executive branch actors. Had the Ben-netts filed their lawsuit in federal court, them federal substantive due process claim would be non-actionable under the Eleventh Circuit caselaw precluding federal review of state executive action. Likewise, federal substantive due process claims asserted in Florida state courts have met a similar fate based on application of the same federal precedents limiting the federal substantive due process right. See City of Pompano Beach v. Yardarm Rest., Inc., 834 So.2d 861, 869 (Fla. 4th DCA 2002) (“[T]o prevail under McKinney [v. Pate, 20 F.3d 1550 (11th Cir.1994) ] on its [federal] substantive due process claim under 42 U.S.C. § 1983, [plaintiff] had to show that the governmental activities in this case constituted ‘legislative’ conduct.”); Jacobi v. City of Miami Beach, 678 So.2d 1365, 1366 (Fla. 3d DCA 1996) (“The federal substantive due process violation claim is also without merit.”). But these federal limitations on the federal right have not been extended to a Florida substantive due process claim brought in a Florida state court. As such, entry of summary judgment on the Bennetts’ state law as-applied substantive due process claim on the basis of federal court cases interpreting the reach of the federal due process clause was unwarranted; the trial court should have addressed the merits of the as-applied state constitutional claim, but did not.
Before discussing the Bennetts’ claim it is worth noting that reported substantive due process cases under the Florida Constitution appear to be limited to facial and as-applied challenges to legislative enactments, such as statutes and zoning ordinances. The absence of Florida caselaw involving state substantive due process challenges to executive actions might suggest that such challenges are non-actionable (like federal substantive due process challenges to state executive actions); it might simply reflect, however, that no Florida court has yet addressed the matter. What we know is that no case has restricted substantive due process claims under the Florida Constitution to only legislative actions; for this reason, we should be disinclined to impose such a restriction judicially in the first instance. Indeed, as a textual matter, article I, section 9, is open-ended, placing no limitation on the branches of government to which it applies. It simply says: “No person shall be *397 deprived of life, liberty or property without due process of law.” Art. I, § 9, Fla. Const. It does not say: “No person shall be deprived of life, liberty or property by the legislative branch without due process of law.” Because article I, section 9, is branch neutral, because as-applied claims are already allowed to challenge legislative enactments,[6] and because no binding Florida case prohibits substantive due process claims against executive action, -it naturally follows that an as-applied substantive1 due process claim is actionable as to executive action, subject to whatever our supréme court might say on the matter. Arizona v. Evans, 514 U.S. 1, 8, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (per Rehnquist, C.J.) (“[Sjtate courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution.”).
Turning now to the Bennetts’ as-applied claim, they argue that the County’s enforcement amounts to an impermissible ad hoc regulatory approach. While what constitutes a residential use may generally be understood categorically, the issue becomes grayer when the range of enforcement interpretations becomes muddled and applied in a potentially arbitrary way. For example, the County initially , took the position that weddings are a permissible residential use whose number can be limited, but took a different approach, as the trial court’s order reflects in the following paragraphs:
F) At a hearing before the Walton County Code Enforcement Board (a body created by defendant Walton County, but not subject to its review in its code enforcement decisions) on the notice of violation, the code enforcement officer who issued the notice and the planning director for Walton County testified that it was the frequency Of the events, not the nature of the events, that was the basis for the notice of violation. Following the hearing, Code Enforcement Board found that the plaintiffs were in violation of the aforementioned code provision.
G) The plaintiffs revised their rental procedures somewhat in an effort to avoid further notices of violation, but were later again cited for a violation of the same code provision. At the Code Enforcement Board hearing on the second notice of violation, testimony was given that it was the event itself, not the frequency of the event, that violated the prohibition against nonresidential uses of the property. The Code Enforcement Board again found that the plaintiffs had violated the same code provision.
(Emphasis added). The italicized findings illustrate that the enforcement of the Code was a moving target, at one point focusing on frequency, while later discounting frequency and banning events regardless of their nature.
Enforcement actions, of course, must be within the authority of the governing zoning code. Henry v. Bd. of Cnty. Comm’rs of Putnam Cnty., 509 So.2d 1221, 1223 (Fla. 5th DCA 1987) (“The authority of a county to seek injunctive relief to enforce its zoning code cannot go beyond its basic *398 power to regulate the use of land.”). The Bennetts point to the testimony of County officials as establishing the arbitrariness of the enforcement actions against them. The County Administrator, who had been the Planning Director, testified that his approach was to ask “would a reasonable person expect [the activity/event] to take place in a residential neighborhood.” While his approach has intuitive sense, it is not grounded in any official County policy that provides further guidance in how it is to be implemented. As to how many events should be permissible, he noted that the County has no official position but his personal view was three. The chief code enforcement officer, with almost eight years in the position at the time he testified, noted that weddings are common on residential properties, that no problems were brought to his attention (other than the Bennetts’ situation), and that more guidance on what events are permissible would help him in his job. He testified that he has “full authority’ to make the determination of what constitutes a violation, which he based on his assessment of whether the activity was outside of what he considered “normal” residential activities or whether the activity “disturbed the neighborhood,” noting it is a “fine line” that he has to draw with “no guidance in writing anywhere” about how to handle a situation like the one presented. Notably, he testified that if an “event” took place on the Bennetts’ property it would now automatically constitute a violation; but he simultaneously testified that no definition of “event” existed and that it was only the Bennetts’ who were subject to the Code Enforcement Board’s directive (due to its finding of a past violation).
For its part, the County highlights that the frequency and scale of the events on the Bennetts’ property, as well as the now-discontinued marketing efforts, were significant factors in its enforcement decision. Common sense dictates that a regulatory line exists between an occasional family wedding on one’s residential property and the proliferation of weekly wedding events with hordes of caterers, bands, and rowdy guests. These are legitimate distinctions, though not mentioned in the Code or other record evidence establishing official policy, which raises questions as to whether they are subject to arbitrary application or impute impermissibly broad discretion. See Effie, Inc. v. City of Ocala, 438 So.2d 506, 510 (Fla. 5th DCA 1983) (finding application of zoning ordinance unconstitutional, stating “the opportunity for the exercise of unbridled discretion is present here, and whether so exercised or not, renders the ordinance unconstitutional”). Is one raucous post-wedding reception too much, but fifteen quiet wedding ceremonies okay? A code need not be encyclopedic to be constitutional in application, Friends of Great Southern, Inc. v. City of Hollywood ex rel. City Commission, 964 So.2d 827, 830 (Fla. 4th DCA 2007) (“The criteria need not be intricately detailed.”), but the absence of standards and guideposts increases doubt about the prospects of constitutionally-consistent application, potentially resulting in “a shifting-sands approach to Code construction” that “does not promote consistency in the application of law.” Town of Longboat Key v. Islandside Prop. Owners Coal., LLC, 95 So.3d 1037, 1042 (Fla. 2d DCA 2012).[7]
Conversely, a law is not unconstitutional as-applied “merely because it is subject to *399 differing interpretations.” Jones v. Williams Pawn & Gun, Inc., 800 So.2d 267, 270 (Fla. 4th DCA 2001) (holding that phrase “of unsound mind” “is not unconstitutionally vague as-applied” in civil action against pawn shop that sold weapon to man with mental problems). And the degree of judicial scrutiny is at its lowest point under the type of rational basis review that applies in this case. Kuvin v. City of Coral Gables, 62 So.3d 625, 632 (Fla. 3d DCA 2010) (“The judicial lens through which this Court must examine the City’s exercise of its police power is governed by well-established law, beginning with the premise that rational basis scrutiny ‘is the most relaxed and tolerant form of judicial scrutiny.’ ” (citation omitted and emphasis eliminated)). “The rational basis standard is concerned only with the existence of a conceivably rational basis, not with whether the basis is actually considered by the legislature, and is highly deferential.” Jacques v. Dep’t of Bus. & Prof'l Reg., Div. of Pari-Mutuel Wagering, 15 So.3d 793, 797 (Fla. 1st DCA 2009). Despite the importance of the right to one’s use of her own property, substantive due process “seeks to find a balance between public and private interests, not to make the landowner lord over the State, nor the State lord over the landowner.” Dep’t of Cmty. Affairs v. Moorman, 664 So.2d 930, 933 (Fla.1995).
Because it dismissed the Bennetts’ as-applied claim rather than adjudicate it, the trial court’s order does not address whether the County’s vacillating enforcement rationales during the relevant time periods meet state constitutional standards. Indeed, at oral argument it was left somewhat unclear how the Code had been applied to the Bennetts and would be applied prospectively. When presented with various hypothetical “events” testing the parameters of what might be deemed impermissible under the ordinance (selling Girl Scout cookies, holding weekly football parties, hosting alumni events, having chicken coops), no consistent approach emerged. And it was left ambiguous whether the current enforcement approach is to prohibit all events or to revert to a case-by-case approach, such as allowing a wedding if it was an isolated event.
Given all this, it is not at all clear from the record presented on appeal that a legally sustainable approach was applied to the Bennetts’ property. The County was permitted to adjudge each alleged Code violation individually and independently in a case-by-case fashion, but each must be undergirded by a rational basis. While the Bennetts and the County each argue that summary judgment should have been entered in their favor, the “record must unquestionably demonstrate a factual basis upon which the summary judgment is premised.” Romeo v. Romeo, 907 So.2d 1279, 1283-84 (Fla. 2d DCA 2005). The current record, which is an amalgam of depositions, code enforcement transcripts, and various exhibits, does not support the entry of summary judgment for the Ben-netts or the County as a matter of law; it does reflect, however, enough factual disputes for the as-applied constitutional claim to be adjudicated on the merits after further factual findings, followed by a determination of whether the Bennetts are entitled to relief.
III.
In conclusion, the fallacy of the beard, or line drawing fallacy, is at play here. That no distinct line exists between where no violation exists (no weddings) and where a violation is obvious (weekly weddings) does not defeat the County’s ability to channel its code enforcement decisions in a reasonably defensible way, given an apparent regulatory challenge in its beach communities. The judiciary’s role in cases like this *400 one is simply to ensure governmental actions do not cross the line into arbitrariness, a low threshold for government to overcome. See City of Jacksonville v. Goodbread, 331 So.2d 350, 352 (Fla. 1st DCA 1976) (“While it is not the function of the Court to rezone property or to usurp the legislative powers of government, it is the Court’s function to determine at which point zoning restrictions become arbitrary.”). Rather than decide the Bennetts’ as-applied state substantive due process claim in the first instance in this Court, I would reverse and remand to allow the trial court to do so.

. When combined with a nearby 6 bedroom property they then owned ("Above It All”), the venue was advertised as sleeping 50 peo-pie. At least one adjoining neighbor made her property available for events.

. A change in November 2014 revised it as 2.01.03(J)(3)(a)(iii).

. As the highlighted language shows, the Ben-netts do not seek a declaration of their rights under the Code. For example, they do not seek a general declaration under section 86.011, Florida Statutes, that weddings are a permissible use on their property under the Code (which, according to the County, they are); instead, the only relief they seek — de-claratoiy or injunctive — -is for an alleged substantive due process violation based on the County’s ad hoc, arbitrary enforcement actions. Section 86.011 — much like section 1983 in the federal code — simply serves as the vehicle for seeking declaration of a constitutional violation.

. The Florida Supreme Court has recognized that the "right of due process contained in article I, section 9 poses a somewhat different problem, because it does in fact guarantee the right to enjoy property. Within limits, that right can include decisions regarding the improvement of property.” Dep’t of Cmty. Affairs v. Moorman, 664 So.2d 930, 933 (Fla.1995).

. Such claims are permissible but are increasingly subject to restrictions imposed by lower federal courts. See Rosalie Berger Levinson, Reining in Abuses of Executive Power Through Substantive Due Process, 60 Fla. L.Rev. 519, 536 (2008) ("The federal appellate courts have been increasingly unreceptive to substantive due process challenges to executive misconduct.”). While we might find the lower federal courts’ approaches preferable in construing a federal substantive due process claim, we must apply state substantive due process principles as construed by our supreme court and this Court. See, e.g., Polakoff, 551 So.2d at 1225-26 (applying same test for equal protection and substantive due process claims were no fundamental right involved).

. Little practical difference exists between lawsuits targeting the application of legislative enactments and those targeting executive enforcement of such enactments. In addition, as-applied substantive due process claims differ little, if at all, from ordinary or class-of-one equal protection claims, each applying the minimal degree of judicial scrutiny under a rational basis type standard. Vill. of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (ordinary and “class of one” equal protection cases analyzed as to whether “there is no rational basis for the difference in treatment”).

. As the Second District has noted, clarity in a code’s meaning “mounts a bulwark against the [government’s] unfettered exercise of power.” Id. at 1042; see also ABC Liquors, Inc. v. City of Ocala, 366 So.2d 146, 151 (Fla. 1st DCA 1979) (absence of standards or criteria in "regulatory scheme” to guide case-by-case exercise of discretion by local government “does not comport with constitutional standards”).